Miller *v.* The State.

———————◦———————

## MILLER *v.* THE STATE.

CRIMINAL LAW.—*Murder.*—*Manslaughter.*—*Use of Deadly Weapon.*—*Malice. Instruction.*—On a trial for murder, where there were some circumstances strongly tending to the conclusion that the crime was murder, and not manslaughter merely; such as the use of a deadly weapon by the defendant, in a manner seemingly cruel and not justified by the danger of the supposed assault by the deceased, and the following the deceased and inflicting upon him a blow with a knife after he had turned and was retreating; and, on the other hand, there were some circumstances that tended in some degree to modify such conclusion; as that the defendant was smarting under indignities inflicted upon him by the deceased, who a short time before had assaulted and chased defendant with a stable fork through the public streets, until he took refuge; and the deceased had also applied to the accused degrading and humiliating epithets;

*Held*, that a charge to the jury, which, after defining manslaughter as an unlawful killing without malice express or implied, stated, that "if a man use a deadly weapon in killing his adversary, the law implies malice from its use,

Miller *v.* The State.

except where the killing is excusable," was in effect telling the jury, that there was no such thing as manslaughter where a deadly weapon was used, as the implied malice made it murder, if it was not excusable; and that the charge was erroneous.

SAME.—*Mortal Wounds.*—*Malice.*—Where there was doubt as to which of the blows was mortal, this instruction should have been given as requested: "If the blows which caused the death of" A., the deceased, "were given in self-defence, and other blows were afterward given, which were not given in self-defence, not mortal, you should find the defendant not guilty."

APPEAL from the Clay Circuit Court.

WORDEN, C. J.—The appellant was indicted for the murder, in the first degree, of Jacob Howk. On trial by jury, he was acquitted of the degree charged, but convicted of murder in the second degree, and sentenced to imprisonment in the state prison for life.

A motion for a new trial was properly interposed, but overruled, and exception was taken.

The evidence is before us, together with the charges given and refused.

The case made by the evidence is, in substance, as follows: The homicide was committed on the 25th day of May, 1870. It may be inferred that, a few days before the homicide, the defendant owed Howk a small sum of money, or rather Howk claimed that the defendant owed him a small sum. Within a day or two before the homicide, Miller was going to a stable to take care of his horse, and as he was going, Howk drew a stone on Miller, and chased him into the stable, calling him a damned Dutch son-of-a-bitch, and told him to come out and he'd be damned if he did not have what Miller was owing him—seventy-five cents—or have it out of his hide. Miller did not come out, but fastened the door behind him. Miller went in at a door from an alley. Howk tried to get in at that door, but could not; he then jumped over into the lot and went into the stable at another door. Soon after, Miller ran out at the same door at which he went in, and Howk was after him with a drawn stable-fork. He chased Miller around two lots, and up an

alley, to one French's grocery store. At the store, one McClure took the fork from Howk, who seemed inclined to follow Miller into the store, but does not appear to have done so. It is to be inferred, though it is not directly shown by the evidence, that before the homicide, Howk had been fined for an assault or assault and battery upon Miller. Miller was in the employ of George W. French as a butcher. The homicide took place in the latter part of the day above stated. On the day of the homicide, Miller had been out, and when he came back to the store he told French that he had been assaulted by Howk as he was driving along with his team; that Howk had thrown a stone at him. On the day of the homicide, but before its commission, Miller said to one person that he had had a fuss with Howk; he drew out a knife, and said if Howk followed him any more he would kill him. Another person heard him say that if Howk fooled with him, God damn him, he would kill him. Another heard him make the same expression, without the oath. Another witness testifies that Miller was telling about a fuss that he had had with Howk, when he said, "damn him; if he fools with me, I will cut him in two." The witness said to him that he would not do that, but would slap him. Miller replied that he had not the money to pay fines.

A short time before the homicide, Miller was sitting on a porch in front of French's grocery store, when Howk was seen coming in that direction. French told Miller to go in, and he went into the store. A few minutes before Howk came up, Miller said to a witness that if Howk "pitched into him" he intended to cut him, and drew a knife from his pocket and exhibited it, which was identified as the one with which the killing was perpetrated. It is described as a butcher's knife, used for skinning. Howk came up, and looked into the store, and saw Miller, being apparently in an angry mood and somewhat intoxicated. He applied to Miller some opprobrious epithet, which a witness thinks was "damned Dutch son-of-a-bitch," and said that he had paid one twelve dollars, and could or wanted to pay another. French

told him to go away, but he did not seem inclined to go. French told him if he did not go away, he would kick him away. French was standing close to the door, facing outward, and Howk stood in front of him, looking into the store. Howk attempted to push French aside, but did not do so. Howk made a step partially to one side, as if to go in, and as he did so, Miller, who was inside of the store, advanced (if he had not before been within striking distance), and while French stood partially between himself and Howk, struck an overhanded blow at Howk over the arm or shoulder of French with the knife above mentioned. This was rapidly followed by another blow while the parties were facing each other. These two blows in front inflicted wounds which are described as "about the collar bone, and five or six inches long, ranging down toward the cavity of the body." Howk turned and retreated a few feet, and Miller followed him up and struck him another blow with the knife from behind. This blow struck Howk between the shoulders, making a wound ranging downward, the knife penetrating the body from four to five inches. The knife was left adhering in the wound so closely that when afterward withdrawn, as was soon done by a bystander, it had, as the witness expressed it, to be "jerked out." Howk walked a few steps after this, and fell, and expired in a few moments. There was no examination of the wounds by any surgeon, and whether death was caused by the wound or wounds in front, or that behind, or all together, can only be judged by the circumstances and the description we have of them.

There is no question made in the cause, except those which arise upon the charges given and refused.

The court gave, amongst others, the following charge:

"Manslaughter is the unlawful killing of a human being, without malice express or implied, but in a sudden heat produced upon sufficient provocation. If a man use a deadly weapon in killing his adversary, the law implies malice from its use, except where the killing is excusable."

The defendant asked the following charge, which was refused:

"20. If the blows which caused the death of Howk were given in self-defence, and other blows were afterward given, which were not given in self-defence, not mortal, you should find the defendant not guilty."

We have concluded that the charge given by the court, on the subject of manslaughter, was not sufficiently full, and might have left a wrong impression on the minds of the jury as to the law of the case, as applied to the facts. The charge, after describing manslaughter as an unlawful killing, without malice, express or implied, states, that "if a man use a deadly weapon in killing his adversary, the law implies malice from its use, except where the killing is excusable." According to this unqualified charge, there can be no such thing as manslaughter where the killing is with a deadly weapon, because the use of it implies malice, and the homicide must, therefore, be murder, if it be criminal at all.

There are, doubtless, cases in which killing with a deadly weapon would not be excusable, and yet would amount to only manslaughter; and the facts in this case do not so conclusively show that the crime was murder, and not manslaughter, as to render any further explanation of the charge or a fuller statement of the law unnecessary.

An eminent and philosophical writer on the criminal law, in discussing "the act which distinguishes murder from manslaughter, viewed without direct reference to the mental condition of the accused," says: "The first point is, that, whenever a man makes use of what in law is called a deadly weapon, without excuse, if death follows the use, he commits thereby murder, and not manslaughter merely. In other words, the law attributes to him the 'malice afore-thought' which makes the homicide murder in distinction from manslaughter." 2 Bishop Crim. Law, secs. 709, 710.

This proposition is laid down, it will be seen, as the law, "viewed without reference to the mental condition of the accused."

The same author, at sec. 720, discusses "the act which distinguishes murder from manslaughter, viewed with direct reference to the mental condition of the accused." Under this sub-title but little is found to our purpose, the author observing that "the question of the intent will be specially considered under our next sub-title," which is (sec. 723), "The act which distinguishes murder from manslaughter, viewed in connection with the conduct of the person killed." The author proceeds: "The crime of murder requires the mind to have acted from deliberation and intelligence; and, where it is clouded by passion, the killing is only manslaughter. This is the general doctrine; but the law has provided rules to determine when the plea of want of mental control may be effectual. The principal illustration of this want is in cases of homicide committed under provocation from the person killed.

"The condition of mind requisite in a case of murder being the matter into which we are now inquiring, we must keep our attention constantly on this point of observation, when looking at the facts of particular cases. And if the killing is really in cool blood, no provocation, however great or sudden, will suffice to reduce it to manslaughter. The question, in short, presented by every homicide of the kind now contemplated is, whether the person who inflicted the injury which resulted in death had really the command of his passions, and acted from a mind undisturbed; or whether reason had lost in part its sway; in which latter case, the further inquiry arises, whether the cause for this loss of reason is one which the law will allow as sufficient to reduce the crime to the lower degree.

"If a man assaults another, the one assaulted may, as we have already seen, strike back in self-defence; but, as we have seen also, he is not on this account entitled to take the assailant's life. Still, as he had the right to strike, the principles already unfolded show, that, if the blow given back is too severe, or if by any other accident it produces death unintended, the person inflicting it is guilty only of

manslaughter, though no passion in him is excited; unless he employs a deadly weapon. If the weapon is deadly, then, supposing the passion not excited, the offence is murder, though committed without any intent to kill. But in those circumstances in which the reason is clouded, if the party assailed uses a deadly weapon, and kills his adversary with it, his offence is only manslaughter. Yet even here, where resistance is made by a deadly weapon, and the weapon is used in a very cruel manner, not justified at all by the nature and danger of the assault, the offence amounts to murder. ' * * * And where two persons, upon a sudden quarrel, engage in mutual combat, if either one, in the heat of it, kills the other, though with a deadly weapon, his offence is ordinarily only manslaughter; nor is it always material which of the two made the first assault. The same is true, where one makes resistance against an illegal arrest; and, his passions becoming excited by the outrage, he kills the aggressor with a deadly weapon."

From this and other authorities that might be cited, it seems to be clear that where a homicide is committed (though with a deadly weapon) in the heat of passion, caused by sufficient provocation of the person slain; as by an assault, or an assault and battery committed by him upon the slayer, the law does not necessarily imply malice from the use of the deadly weapon; nor is the offence necessarily murder.

It will be remembered that one of the two classes of manslaughter, provided for by our statute consists in the unlawful killing, without malice, "voluntarily, upon a sudden heat."

In the facts of the case before us, there are some circumstances which strongly tend to the conclusion that the crime of the accused was murder, and not manslaughter merely; such as the use of a deadly weapon in a manner seemingly cruel, and not justified by the nature or danger of the supposed assault upon himself by the deceased, and the following up and inflicting a blow upon the deceased, with the knife, after he had turned and was retreating.

But, on the other hand, there are some circumstances that

Miller v. The State.

tend in some degree to modify such conclusion. He was smarting under the indignities inflicted upon him by the deceased, who had assaulted him and chased him, with a stable-fork, from his stable, through the public streets, until he took refuge in his place of business, and some one took the fork from the deceased. The deceased had also applied to the accused degrading and humiliating epithets. Mere words, it is true, furnish no sufficient justification for a deadly assault; but words added to an assault may suffice, when the assault would not alone. 1 Bishop Crim. Law, sec. 729; *Regina* v. *Sherwood*, 1 Car. & K. 556.

We are not prepared to say that the jury might not have found, under the evidence, that the deceased, at the time of the homicide, was renewing his attack upon the accused; and that the accused was wrought up to such sudden heat by the renewal of the attack, and in view of his recent treatment by the deceased, as to reduce the crime to manslaughter. He was, at least, entitled to have the law stated to the jury more fully and correctly than was done in respect to this view of the case. Had that been done, the jury would have been better enabled to determine understandingly whether the crime committed was murder, or only manslaughter.

We are also of opinion that charge number twenty, asked by the accused, should have been given. From the want of a more thorough examination of the wounds inflicted upon the deceased, it must remain in some degree uncertain which one was the mortal wound, or whether they were all mortal. It may be that the wounds in front were mortal, and the one in the back not mortal. If the wound in the back was not mortal, the appellant should not be convicted of murder for inflicting it; and if those in front were alone mortal, yet if they were inflicted in self-defence (which means, as we understand it, necessary and proper self-defence), he should not be convicted of murder for inflicting them. The charge is correct, as we think, in the abstract, and we cannot say

that it was so totally irrelevant to the case made as to justify its refusal.

The judgment is reversed, and the cause remanded for a new trial; proper notice to be given for return of prisoner.

*S. Claypool, S. W. Curtis*, and *S. F. Stimpson*, for appellant.

*J. C. Robinson* and *B. W. Hanna*, Attorney General, for the State.