MICHAEL E. SHUTT *v.* STATE OF INDIANA.

[No. 1076S358.  Filed October 21, 1977.]

*John C. Bunner,* of Evansville, for appellant.

*Theodore L. Sendak,* Attorney General, *Daniel Lee Pflum,* Deputy Attorney General, for appellee.

PRENTICE, J.—Defendant (Appellant), a seventeen year old boy, was charged with second degree murder, Ind. Code (Burns 1975) 35-1-54-1, convicted of that offense in a trial by jury and sentenced to imprisonment for an indeterminate term of fifteen to twenty-five years. That the defendant killed the deceased is not in dispute. Two issues are presented on this direct appeal.

(1) Propriety, under the evidence, of an instruction advising that one who has no reasonable grounds for apprehension may not successfully interpose the defense of self defense.

(2) Sufficiency of the evidence, as to the essential element of malice.

## ISSUE I

It is the defendant's position, upon this issue, that there was no evidence that the defendant was not acting in self defense and that, therefore, the following quoted portion of the instruction on self defense was inapplicable and served only to disparage the self defense claim. The instruction was lengthy and appears to have advised fully upon the principles involved and concluded with the following statement:

"One who is in no apparent danger and who has no reasonable grounds for such apprehension cannot kill another and successfully interpose the defense of self-defense."

Although there was no evidence directly controverting the evidence that the defendant had been threatened and that he was in fear, whether or not his apprehension of danger was reasonable was, nevertheless, a question of fact. We disagree with the defendant's statement that there is no evidence in the record from which one could say that he had no reasonable grounds for apprehension. Although there was no direct evidence to disprove his claimed mental state, whether or not it, in fact, existed and whether or not it was reasonable, if it did exist, had to be determined by the jury

from all of the evidence. The defendant has cited *Dipert* v. *State*, (1972) 259 Ind. 260, 286 N.E.2d 405, and *Huddleston* v. *State*, (1973) 260 Ind. 398, 295 N.E.2d 812, wherein we reversed because the instruction relating to the defense of insanity strongly suggested, in each case, that the defense might be a ruse and that the evidence thereof should, therefore, have particular scrutiny.

The portion of the instruction complained of may have been an unnecessary appendage, as it simply restated, in negative terms, what had already been said in the affirmative, apparently for the purpose of emphasizing the requirement of reasonableness. However, we see no disparaging tenor to it. It was a correct statement of the law and was applicable under the totality of the evidence.

## ISSUE II

The variances in the testimony are but slight. The issue is whether or not the essential element of malice could be found therefrom, beyond a reasonable doubt. We are governed by several precepts which are sometimes difficult to harmonize. First, we must recognize the basic premise of appellate review:

"When the sufficiency of the evidence is raised as an issue upon appeal, this Court will consider only that evidence of probative value most favorable to the State, together with all logical and reasonable inferences which may be drawn therefrom. If such evidence and inferences would permit a reasonable trier of fact to find the existence of each element of the crime charged beyond a reasonable doubt, the verdict will not be disturbed." *Baum* v. *State*, (1976) 264 Ind. 421, 345 N.E.2d 831 at 834, 835, and cases there cited.

"As this Court has repeatedly emphasized, it will not on appeal judge the weight of the evidence or the credibility of the witnesses. *Lottie* v. *State*, (1974) 262 Ind. 124, 311 N.E.2d 800; *Brown* v. *State*, (1974) 261 Ind. 619, 308 N.E. 2d 699; *Turner* v. *State*, (1972) 259 Ind. 344, 287 N.E.2d 339; *Gibson* v. *State*, (1971) 257 Ind. 23, 271 N.E.2d 706; *Fuller* v. *State*, (1971) 256 Ind. 681, 271 N.E.2d 720." *Rosell* v. *State*, (1976) 265 Ind. 173, 352 N.E.2d 750, 751.

Secondly, in our review, we must also accommodate for possible unreasonableness of the fact finder's verdict, otherwise our review would be but a sham and a useless exercise in futility. If the inference drawn by the trier of facts must rest upon speculation or conjecture, it cannot be drawn beyond a reasonable doubt, and we are required to set it aside. "It is not enough to sustain a conviction that the evidence, when given full faith and credit, may warrant a suspicion or amount to a scintilla." *Baker* v. *State,* (1956) 236 Ind. 55, 60, 138 N.E.2d 641.

Although it is not disputed that the defendant killed the deceased, the element of malice which is essential to the validity of the verdict, was in issue and, by its nature, could be proved only by circumstantial evidence. In *Manlove* v. *State,* (1968) 250 Ind. 70, 232 N.E.2d 874, on rehearing 250 Ind. 85, 235 N.E.2d 62, we clarified the prerogative and responsibility of this Court upon a claim that the verdict is not sustained by sufficient evidence. Justice Hunter, writing for an unanimous court, articulated it as follows:

"Therefore on the matter of sufficiency of the evidence in the case before this Court we must determine whether there was adequate and substantial circumstantial evidence from which the jury could have drawn a reasonable inference of the appellant's guilt. In so doing we are only exercising the duty and responsibility of a court of review, and while we may not weigh the evidence we must pass upon its sufficiency as a matter of law. Baker v. State (1956), 236 Ind. 55, 138 N.E.2d 641; Christen v. State, supra; Howard v. State (1921), 191 Ind. 232, 131 N.E. 403 and other cases too numerous to cite. There must be substantial evidence to support the verdict on each essential element of the crime charged. If there is not such evidence in support of the verdict, then it becomes an error at law which may be reviewed and corrected on appeal. Howard v. State, supra; Baker v. State, supra. Likewise, in passing upon the sufficiency of the evidence where it is wholly circumstantial in character, this Court will, in the event an essential element is lacking, hold the evidence to be insufficient and the verdict contrary to law." 250 Ind. at 77, 78.

"Thus it is clear that where evidence is wholly circumstantial and fails to exclude every reasonable hypothesis of innocence such evidence is not sufficiently persuasive to allow a reasonable man to find the accused guilty beyond a reasonable doubt and such a finding and judgment of guilty cannot stand. Osbon v. State (1938), 213 Ind. 413, 13 N.E.2d 223; McAdams v. State (1948), 226 Ind. 403, 81 N.E.2d 671 and cases cited therein. To the extent the language in Christen v. State, supra, indicates this Court cannot pass upon the question of whether wholly circumstantial evidence excludes every reasonable hypothesis of innocence, such language is disapproved. For if the jury is bound to follow such a guideline in reaching its verdict, (and this Court has so stated the rule time and again, and trial courts have so instructed juries in Indiana for more than a century) then this Court must have the authority and duty on review to determine whether that guideline has been adhered to. If such is not the province and duty of this Court on appeal, then the jury's conduct in that respect would be immune to any judicial review and the right of appeal on the question of the sufficiency of circumstantial evidence would be an impotent and useless procedural rule." 250 Ind. at 79, 80.

Thirdly, it is settled that malice may be inferred from the intentional use of a deadly weapon in such a manner as is likely to cause death. *Dobbs* v. *State*, (1957) 237 Ind. 119, 143 N.E.2d 99; *Martin* v. *State*, (1957) 236 Ind. 504, 141 N.E.2d 455.

However, such inference may be rebutted. *Dickinson* v. *State*, (1944) 222 Ind. 551, 55 N.E.2d 325; *Landreth* v. *State*, (1930) 201 Ind. 691, 171 N.E. 192.

We believe the facts of this case can only justify a conviction for voluntary manslaughter, and that the inference of malice said to arise from the circumstance of the defendant's use of a knife could *not*, under all the circumstances, have excluded every reasonable hypothesis of innocence. It, therefore, was not sufficiently persuasive to allow a reasonable man to find the defendant guilty of second degree murder beyond a reasonable doubt.

## THE EVIDENCE

For other purposes the evidence presented in this case could be briefly summarized. A reversal for insufficiency of the evidence, however, necessitates a presentation of the evidence in considerable detail, lest evidence be overlooked which, if presented, would have provided the essential missing link. We find it necessary, therefore, to burden this opinion with an unusually lengthy recitation of the testimony.

State's witness, Russell Davis, age fifteen, testified that he had known the defendant for about ten years and that they frequented the pool hall together where the fatal encounter had occurred. The witness did not know the decedent, Dave Green, and had not seen him previously. When Russell arrived at the pool hall at about 5:00 p.m., the defendant was playing pool with another friend, Roy Durham. A third friend, David Braden, was waiting to play the winner. About half-an-hour later, the decedent entered with a friend, Scott Ranney. They were both wearing red caps. They sat down, bought a soft drink and started talking to each other. They did not speak to the defendant or his associates, nor did the defendant or his friends speak to them. The defendant gave no indication that he knew either of them. The witness, however, commented to the defendant that they looked as if they were looking for trouble, but he did not say why he arrived at such a conclusion. Whereupon, the defendant left, saying "Well, I am going home to eat supper, anyhow, and I might as well go home now."

The defendant proceeded outside, and as he did, the decedent called to the defendant, saying "Are you Mike Shutt?" To which the defendant replied, "Yeah." The decedent told the defendant to come over to where he was, which he did. After the defendant walked up to the decedent, they started arguing, but the witness could not hear what was being said. Ranney was not involved but was nearby. Braden walked out and in once in a while while this was going on, but Durham remained

inside. Then the decedent flipped a cigarette against the defendant and swung at him. The witness saw no pushing or shoving at this time. The deceased was a lot bigger than the defendant. The decedent was swinging at the defendant as the witness looked away momentarily, and when he glanced back, he saw the defendant stab the decedent in the chest with a knife believed to be a pocket knife with a single edge blade about three inches long.

The witness saw only one blow with the knife and the decedent fell to the street. The defendant stood there for a minute, as if he could not believe what he had done. He said nothing. Ranney grabbed a pool cue from a boy and ran toward the defendant, who ran to his automobile parked at the curb and drove away.

About four days previously, the witness and the defendant were playing pool at the same pool hall, when a big fat guy weighing about two hundred thirty pounds and being about thirty-eight years old was also there playing pool. There was a crowd present. He started shoving the defendant and calling him names. The witness later learned that this man was a relative of the deceased.

The day prior to the killing, (Bivins) a big man, about six feet three inches tall and about thirty-five years old entered the pool hall where the defendant and the witness were playing. He called the defendant names, but the defendant did not do anything and there was no physical violence. The defendant returned to his pool game for awhile and then went home and returned with his father, after which nothing further happened. The witness later learned that this man was the decedent's uncle.

State's witness, Margaret Jackson, resided upstairs over the pool hall. Her son directed her attention to the disturbance below. She did not see the fight but looked outside just in time to see the defendant enter his automobile. She did not notice anyone chasing him. He was holding a knife in his

hand, pointed up. She saw the knife for just a few seconds. It looked to her to be about eight inches long, not just the blade but its total length, like a letter opener, sharp on the end and on both sides. She could not see the handle, but she did not believe it was a pocket knife. She knew the defendant but had never seen either the decedent or his companion before.

State's witness, Bonnie Jackson, age fourteen, had previously dated the defendant and was a close friend, but she was not dating him at the time of the October 21st incident. She saw part of the incident but not all of it. She did not see the actual stabbing. About forty-five minutes earlier, she had seen the decedent outside the pool hall, apparently alone but talking to two other boys. She did not then know who he was. At that time, the defendant was not at the pool hall. The decedent left and returned with Ranney about forty-five minutes later. They entered the pool hall. About five minutes later, the defendant came out, walked to his car and said he was going home. The decedent came out, and he and the defendant started arguing. The witness did not know what they were saying, but heard the decedent mention his little brother and the defendant say that he did not know what he was talking about. As the boys argued, the witness went upstairs momentarily. When she returned, they were shoving each other, and the decedent fell to the sidewalk. The defendant stopped, then went quickly to his car. Ranney was there at that time and had a pool stick. The defendant had something in his hand as he went towards his car. She did not know what it was, but it could have been a knife.

State's witness, Joey Jackson, age twelve years, also resided above the pool hall. He was watching television near the open window. The first thing he saw was the decedent and the defendant standing face to face, the defendant strike the decedent and the decedent fall to the ground bleeding. He did not see the knife. He ran downstairs and saw Ranney grab

a pool stick that was standing near the doorway. Ranney ran after the defendant, who ran to his car and drove away.

State's witness, Roy Durham, age eighteen, lived near the pool hall and frequented it. He knew most of its patrons, including the defendant, although not by name. He had never seen the decedent before. Immediately prior to the fight, he was at the pool hall with the defendant and David Braden. He was playing pool with the defendant, when the decedent and Ranney came in. He did not know either of them. They walked behind the witness and the defendant, sat down and watched. The witness won the game and started to play a game with Braden, who was waiting to play the winner. The defendant walked outside, but the witness did not hear him say anything as he left. The decedent and Ranney followed him outside. He did not hear anyone speak, as they left, and he did not go outside until the fight was over and the officers had arrived. He did hear the boys arguing outside. He heard the defendant say "I don't know what you are talking about. I don't want to fight you." And he heard Ranney say, "Come on man. Come on, let's leave."

The witness looked out the door once and saw the decedent falling backwards and the defendant backing away. Then the defendant went towards his car and Ranney grabbed a pool cue and ran towards him but then stopped and went back to try to help the decedent. The witness did not see the knife, not even as the defendant ran towards his car. He did see a homemade knife fall from the defendant's car a couple of days earlier. The blade "looked sort of like an envelope opener." The handle looked like a screwdriver handle.

State's witness, David Braden, age seventeen, testified that he knew the defendant but not the decedent, that he frequented the pool hall and was there at the time of the fight. He had been there most of the day having come and gone several times, and lastly entered with the defendant. The defendant

and Durham played a game of pool and the defendant left, saying he was going home to eat supper. The decedent and Ranney entered while that game was in progress. He had not known either of them prior to that day. The decedent had been there earlier that day, drank a soft drink and left. Decedent and Ranney arrived in a truck, parked and left the engine running and were whispering as they entered. Both were wearing hats that had John Deere tags. Four days earlier, the defendant "had trouble with other parts of that family, and they was wearing those, too, so I told Mike (defendant) I thought they might be some of the Greens, and he said he was going home and eat supper because he didn't want any trouble." And he left.

The decedent and Ranney followed the defendant outside. The witness remained inside by the door. When the defendant reached his car, the decedent called him back and told him he had been messing with his family. The defendant denied it, and the decedent said that he had rubbed chalk in his cousin's—or brother Cecil's hair. The witness spoke up and said that he, Larry and Cecil had been playing and that he not the defendant, was the one who had rubbed chalk in Cecil's hair. The decedent replied, "Well, that doesn't matter, then you been messin with my fat uncle." At that point the defendant said no he wasn't—that his "fat uncle was messin with him." Then the deceased "thumped" ashes or a cigarette on the defendant and they started exchanging pushes. The witness was not certain, but believed that the decedent pushed the defendant first. When it started, Ranney was standing right beside the decedent, but he got the pool cue after the stabbing. The defendant and the decedent shoved each other five or six times each. Then the decedent "took a swing at Mike and missed him." It was with his fist. The defendant ducked then he saw the defendant waving his hands. He was not jabbing but was swinging his hands back and forth in front of his face to keep the decedent from hitting him in the face. The decedent was going towards the defendant as

if he was going to get a headlock on him. He assumed that the defendant had the knife, but he did not see it and did not see the stabbing. He saw the decedent fall and blood come from his chest. He did not see the defendant swinging his hands until after the decedent swung at him. When the defendant entered his car, something was in his back pocket, but the witness could not say positively that it was a knife.

Earlier the witness had told a police investigator that he had seen the defendant with a knife, but he was referring to the day before, when he saw a knife in the defendant's car. It had a blade three or four inches long. After the decedent fell bleeding, Ranney came out of the building and was going to hit the defendant with a cue stick so the defendant got in his car and left.

About four days prior to the fight, two men, one about thirty-five or forty years old and weighing about two hundred fifty pounds and the other about forty-five years old and weighing about three hundred pounds were shooting pool in the pool hall. After they finished, the defendant picked up one of the cue sticks they had been using, since there were not many good cue sticks in the hall. The "fat guy" called the defendant a "cotton top." Then he grabbed at him and called him names. The defendant argued with him, and he picked up a cue ball and started to hit the defendant in the head with it, but did not. At the witness' request, the men left but then returned, started some more trouble and then left again.

The following day, the witness saw the "fat guy" and the defendant in their automobiles. The "fat guy" appeared to be chasing the defendant. The defendant did not come to the pool hall that day. The next day, James Bivins, a cousin to the decedent, came into the pool hall and started calling the defendant names and said if the defendant didn't like it to do something about it. The defendant said he did not want trouble and left. He returned with his father and Bivins caused no further trouble and left.

State's witness, Scott Ranney, age nineteen, testified that he and the decedent were good friends and were employed at the same place. The decedent did not appear at work on the day of the fight and the witness went to his apartment at noon to ascertain why and learned that he was not feeling well. The decedent asked him to return after work and to help him move a dinette set into his apartment from his mother's home. The witness returned after work in his truck to render the requested assistance. He drove but was not familiar with that part of the city, and the decedent directed him. As they passed the pool hall, the deceased said "There's Mike's car. Would you please stop. I want to go in and talk to him." The witness was reluctant, because he did not have much gasoline and had a low battery. He suggested that they go get the table and that he then leave the decedent at the pool hall, but the decedent insisted, so they stopped and entered the pool hall. As they entered, the decedent slowed down and looked around. The witness went to the coke dispenser and got a coke. He may have sat down for a second or two. He did not hear anything said. Some people around the pool table started to leave. He saw the decedent walk out. The defendant had preceded him. The witness followed and sat down on a post near the front of the building. He had his coke with him. He did not hear the decedent call to the defendant. He heard the defendant and the decedent arguing, something about a head or a hat, a relative of the decedent's and some chalk getting rubbed. The witness got up, tapped the decedent on the shoulder and said, "Come on, let's go" and started walking towards his truck. Up until this time, there had been no pushing or shoving. He did not hear any threats by either boy. When his back was turned, he heard scuffling shoes on the pavement. He turned and saw the boys had moved in close together. The decedent was swinging at the defendant, who had a knife and stabbed him twice.

The knife was fairly long and slender—like an imitation of a switchblade. He could not tell if the blade folded into

the handle. The blade was about five inches long. The decedent was eighteen years old, was several inches taller than the defendant, not more than six inches, and weighed a little more. After the stabbing, the witness took a pool cue from a boy standing in the doorway and chased the defendant into his car. The defendant had the knife in his hand at that time and the witness did not see him put it anywhere.

State's witness, Dr. Venables, a qualified pathologist, testified that he did an autopsy on the body of the decedent and made several tests, including tests of the blood of the decedent. Decedent's blood alcohol level was .04% indicating the consumption of one beer, or less, and no state of intoxication. Decedent had received two knife wounds, a superficial incised would in the shoulder and a fatal chest wound which punctured and lacerated the aorta. This wound entered from left to right. It was made by a sharp instrument with a cutting edge. At the midpoint of this wound, there was a slight jagged edge, apparently made by movement of the hand holding the knife or movement of the body. The wound could have been caused by the knife marked as defendant's exhibit number 1. The test of the knife blade for hemoglobin was negative, but he was not the first to test it and there was a good possibility that the police who had tested it previously had wiped the knife clean.

State's witness Dorothy Burke, a police officer, testified that at about two hours after the fatal fight and while the defendant was in her custody at police headquarters, his brother came to see him and started into the room where he was seated. She stepped between him and the doorway and told him he would have to stay out. The brother, in her presence, then asked the defendant what was the matter, and the defendant replied, "Well, no one would help me so I had to do the job myself."

State's witness Virgil Phipps, a police detective, testified that he participated in the investigation of the crime, approxi--

mately one hour after its occurrence, and that while he was at the scene another officer investigator pointed out to him a pocket-knife lying on the ground in some bushes by the west wall of the pool hall. The knife was closed. He picked it up with a piece of paper also found in the bushes, took it to police headquarters, placed it in a plastic bag and turned it over to the identification personnel.

Defense witness Martin Shutt, the defendant's father, confirmed the prior testimony of certain State's witnesses and the later testimony of the defendant concerning the incident in the pool hall with the man named Bivins. He identified the defendant's exhibit number 1 as looking like a knife that belonged to his son and said that he was not aware of any knife belonging to his son, other than pocket knives. He keeps a knife with a round file handle made of wood in his automobile in a tool box. His son sometimes drives his car but did not drive it on the date of the fight. When his son came home after the fight, he did not give him a knife. The police searched the house, without consent but without objection.

Defense witness Greg Knight, visited the pool hall occasionally and was there on the evening of the incident between the man Bivins and the defendant. He confirmed that Bivins was the aggressor and accused the defendant of "smarting off" to some of his kinfolks and called him a "stupid son-of-a-bitch" several times.

Defense witness, Dewey Jacobs, testified that the decedent's reputation for peace and quietude was bad.

Defense witness William Egan, a police officer, supervised another officer test the blade of the knife (defendant's exhibit number 1) for hemoglobin. The results were positive. Such results indicated the presence of blood, but other matter could also give such results. The test, therefore, was not conclusive. He did not see blood on the knife.

Michael Shutt, testifying in his own behalf, added little not previously presented. He was seventeen years old at the

time of the trial, resided three blocks from the pool hall and went there frequently. He worked for a veterinarian from 8:00 a.m. until 4:00 p.m., but was off on Thursdays. He worked on the day of the fight but had finished at 2:00 p.m. He went home, arriving at about 2:30 p.m. and then to a friend's house for a while and from there, he and the friend, David Braden, went to the pool hall, arriving at about 4:50 p.m. He drove his own automobile to the pool hall and parked by the side door.

During the preceding week, on Thursday, he went to the pool hall in the morning and some "fat guy" called him an albino. He ignored him. That night, the fat guy was at the pool hall again playing a game. When he finished the game and laid down the pool stick, the defendant picked it up, because there were not many good ones in the house. The man started a confrontation over the stick, saying he was not through with it. The man called the defendant names, pushed him a couple of times and acted as if he was going to hit him with a pool ball. He then said he was going to get "two punks to beat me up, mess me up pretty bad." The defendant did not strike him but just walked away from the table. The following day the defendant stayed away from the pool hall, because he was afraid the man might be there again. The next day, the defendant's friends told him that they had seen the man following him in his automobile.

Two days following the argument with the fat man over the pool stick, which was the night before the fight, the defendant was accosted in the pool hall by a man not then known to him, but who he later ascertained was Bivins. Bivins called him names, and when the defendant asked why, he said for him not to "smart off to him" or he would "lay him out on the floor." The defendant left and got his father.

After the defendant arrived at the pool hall on the day of the fight and was playing pool, the decedent and Ranney arrived. Defendant had never seen either of them before.

Braden, one of the defendant's companions, told him that he had seen some of the Greens with those two, that they wore the same kind of hats and that he figured they were there to make trouble. The defendant replied for him not to worry that he was going home to eat anyway. The defendant walked out the door and got almost to his car when the deceased called him back to the front of the pool hall. The defendant walked over to him. Ranney was then standing behind the defendant. The deceased accused him of "messin" with some of his family, relating the chalk rubbing incident. Defendant denied it, and his companion, Braden, interjected that he was the one who had done that. Then the decedent said the defendant had been "messin" with some fat guy, and the defendant said, "No, he started it with me." Decedent kept talking and wanting the defendant to go into the street and fight, but the defendant refused. The decedent then flipped his cigarette onto the defendant and continued talking and trying to get the defendant to move away from the pool hall, because the owner had told them to get away.

Next, the decedent pushed the defendant and took a swing at him. The defendant saw Ranney behind him and believed that he was going to jump him, because earlier "the guy had said that he was going to have two boys to jump him." Defendant was scared and took his pocket knife (exhibit number 1) opened it and waved it to keep them away. The decedent jumped towards him and was cut on the shoulder. The defendant looked back to see where Ranney was and saw him coming towards him with a pool stick. The decedent jumped toward him again to get a headlock, and the knife went into his chest.

The decedent had said "We're going to mess you up if you go out in the street and fight," and when he said "we" the defendant figured both he and Ranney were going to jump on him. He did not intend to cut the decedent but intended to use the knife only to keep the two away from him. He saw the decedent staggering but did not see him fall. He turned

and was being chased with a stick, so he ran for his car. On the way, he slipped and the knife went out of his hand. He did not know if it went into the bushes. He did not hear Ranney request the decedent to leave while the altercation was still in the verbal stages.

On rebuttal, State's witness, Virgil Phipps, testified that he was a family man, had known the decedent for fifteen months and that he was of good moral character.

The foregoing is all of the evidence presented, other than testimony of several police officers concerning their involvement in the arrest and investigation. With the possible exception of the following, none of such testimony bears upon the issue with which we are concerned.

One officer testified that following the defendant's arrest he said "It was either him or me" and later said "I must have got him in the heart, or stabbed him in the heart to make him bleed so much." Another of the officers testified that when the defendant was asked if he knew where the weapon was, he replied that he was scared and that all he knew was that he threw it away and that it was a folding pocket knife.

From the foregoing recited evidence, the jury was warranted in finding that the defendant did not act in self defense when he killed the decedent. Although the burden was upon the State to prove, beyond a reasonable doubt, that he was not acting in self defense, one of the factors necessary to justify killing in self defense is the bona fide fear of death or great bodily harm. *Banks* v. *State*, (1971) 257 Ind. 530, 276 N.E.2d 155. But, whether or not there was such a state of mind must be found objectively in the light of the surrounding circumstances, and the standard for determining that issue is the reasonableness of such belief under the circumstances. Although the burden is upon the State to prove the absence of such belief, since that requires the proof of a negative proposition, the evidence is sufficient, on appeal, if it could be found, beyond a reasonable doubt, that a reasonable man would not have had such fear.

In *Nelson* v. *State,* (1972) 259 Ind. 339, 287 N.E.2d 336, we held that although the State was required to prove the absence of self defense, it carried its burden in its case in chief, by showing that the defendant was the aggressor and had no basis to believe that he was in danger of death or great bodily harm. Evidence that the defendant, in that case, was the aggressor was persuasive upon the issue. By no means, however, is such the exclusive means of disproving that the defendant acted without fault. We cannot say, therefore, that the jury could not properly have found that the defendant was not acting in self defense when he stabbed the decedent, and this is not in contention in this appeal.

That the defendant was not properly acting in self defense, however, does not ipso facto render him possessed of malice requisite to a valid conviction for murder in the second degree. There is, after all, a degree of intentional homicide that is neither justifiable nor malicious, within the meaning of our murder statutes.

> "If a sane man, without accident, justification, or any provocation, suddenly kill another, even a stranger, the act must be attributed to malice, because it could be accounted for upon no other hypothesis, based upon the laws governing the action of the mental and moral faculties of man. Such an act would evince a degree of depravity of heart, almost excluding the possibility of any higher moral feeling than malice against all mankind. But human experience will bear witness that provocation may excite a transport of passion, accompanied by a momentary intention to kill the dearest and most beloved friend, against whom no malice exists. And passion, upon sufficient provocation, tends to rebut the presumption of malice." *Dennison* v. *State,* (1859), 13 Ind. 510, 511.

In *Miller* v. *State,* (1871) 37 Ind. 432, this Court reversed a conviction of second degree murder under circumstances similar to those in this case, in that there had been provocative acts directed against the defendant that had continued for a period of several days prior to the killings. The trial court had given the following instruction: "* * * If a man use a

deadly weapon in killing his adversary, the law implies malice from its use, *except where the killing is excusable.*" (Emphasis ours.) After quoting hypotheticals at length from Bishop, declared by the writer of that opinion to be "an eminent and philosophical writer on the criminal law," we concluded:

> "From this and other authorities that might be cited, it seems to be clear that where a homicide is committed (though with a deadly weapon) in the heat of passion, caused by sufficient provocation of the person slain; as by an assault, or an assault and battery committed by him upon the slayer, the law does not necessarily imply malice from the use of the deadly weapon; nor is the offense necessarily murder." 37 Ind. 432 at 438.

The *Miller* case was reversed by reason of the erroneous instruction and not for insufficiency of the evidence, but it serves well to illustrate that circumstances may exist under which the malice that is requisite to second degree murder may not be found or inferred, beyond a reasonable doubt, although a deadly weapon was intentionally used in a manner likely to cause death. The inferences of intent and malice arising from such use of a deadly weapon are valid and can alone support a verdict. But the failure to recognize that such inferences, nevertheless, are frail before the winds of undisputed facts blowing in opposition, would be to acknowledge that a murder conviction could never be reversed for insufficiency of the evidence, where the death was inflicted with a deadly weapon. It, therefore, seems reasonable to conclude that the inferences so arising are counterbalanced by unrefuted evidence that would reasonably support a finding that the use of the weapon was accidental or provoked by anger, fear or other unreasoning or overmastering state of mind.

Notwithstanding that the evidence amply supports a finding that the defendant used a deadly weapon in a manner likely to cause death, thus giving rise to an inference of

malice, such inference is rebutted by much unrefuted evidence, most of which came from the State's own witnesses.

The defendant did not know the decedent or Ranney and had never seen either of them before. The defendant's friend, Davis, believed that they were likely in the poolroom to start trouble with the defendant, and had so informed him. The defendant said that he wanted no trouble and left the place, where he had every right to be. The deceased and his companion followed the defendant outside, and the deceased called him to him, as the defendant was entering his vehicle to leave. He accused the defendant of misconduct towards his relatives, misconduct of which the defendant was not guilty and which he denied. He then said that it did not matter because he had offended another of his relatives. The decedent then displayed contempt for the defendant by throwing a lighted cigarette against him. The defendant told the decedent that he did not want to fight him and in fact did not engage in any physical violence until after the decedent swung at him with his fist. It appears very clearly that the decedent had come to the pool hall for the express purpose of having a physical confrontation with the defendant and was not going to be denied. The decedent was considerably larger than the defendant, and his companion was nearby. On several occasions, shortly before the incident, the defendant had been harassed and threatened by two large middle aged men who were known by the defendant to be allies of the deceased.

It is not necessary for us to invade the exclusive province of the jury to determine the weight of the evidence and the credibility of the witnesses, because no reasonable man deliberating in the face of these established circumstances could exclude, beyond a reasonable doubt, the hypothesis that the defendant was motivated by fear or anger, or both, when he struck the fatal blow. The inference of malice, therefore has been counterbalanced and reduced to a mere speculation. And if it is to rise again with sufficient force to stand as an

inference or fact which could be found by a reasonable man, beyond a reasonable doubt, it must be supported by probative evidence aside from the use of the weapon itself.

"We recognize the rule that we may not weigh the evidence and may only review that evidence most favorable to the state to determine, on a sufficiency of the evidence question, whether we shall affirm or reverse the judgment of the trial court. Such appellate duty, of which we take cognizance, in far too many cases requires that we probe and sift the evidence. Thus, if as a result of our probing and sifting the evidence most favorable to the state, we determine that the residue of facts is so devoid of evidence of probative value and reasonable inferences adduceable therefrom, as to preclude guilt beyond a reasonable doubt, we should so declare. A failure to do so is a rejection of our duty as an appellate tribunal and tantamount to the enunciation of a rule that any evidence no matter how infinitesimal or inferences drawn therefrom, whether based on speculation or conjecture, would be sufficient to establish guilt beyond a reasonable doubt. This we are not inclined to do for to assume such a judicial posture, neglecting our appellate responsibility, would reduce the appellate process to an exercise in impotent and meaningless futility. See Manlove v. State (1968), 250 Ind. 70, 232 N.E.2d 874; Baker v. State (1956), 236 Ind. 55, 138 N.E.2d 641." *Liston* v. *State,* (1969) 252 Ind. 502, 511, 512, 250 N.E.2d 739.

In the recent case of *Dickens* v. *State,* (1973) 260 Ind. 284, 295 N.E.2d 613, we modified the judgment of the trial court, directing that the conviction for second degree murder be set aside and one entered for voluntary manslaughter. We did so, notwithstanding that the homicide had been effected with a deadly weapon intentionally used in a manner likely to produce death, because of the totality of the circumstances, and we there said at page 293 "Looking at the totality of circumstances, we believe there was sufficient provocation to evoke great terror in the mind of the appellant. The deceased's heavy drinking and pill taking, his earlier threat on appellant's life, his firing of the gun into the ceiling a few days before the killing and his inexplicable irrational behavior

just prior to the shooting constitute provocation sufficient to give rise to an impassioned mind incapable of cool reflection."

In the case before us, the totality of the circumstances was likewise sufficient to provoke both anger and fear in the mind of the defendant, sufficient to give rise to an impassioned mind incapable of cool reflection. The defendant had been badgered for several days and threatened with physical violence. He had sought to avoid trouble, and was, in fact, retreating for that purpose when he was accosted by the decedent. He was somewhat smaller than the deceased, and the deceased was accompanied by one who appeared to the defendant to be his confederate. Unquestionably the defendant used poor judgment in resisting violence with force that was unreasonable under the circumstances. However, such was, nevertheless, entirely consistent with the hypothesis of an unreasoning or overmastering state of mind.

Voluntary manslaughter is a necessarily included offense of murder in the second degree. The evidence before us supports a verdict of voluntary manslaughter beyond a reasonable doubt, and it was necessary for the jury to have so found, or it could not have returned the verdict of guilty of second degree murder. Inasmuch as the evidence is insufficient only upon the element of malice, without which the evidence is nevertheless sufficient for the included offense, we remand this cause and instruct the trial court to vacate the judgment and sentence as to second degree murder and enter judgment and sentence upon the necessarily included verdict of guilty of voluntary manslaughter.

Givan, C.J. and DeBruler, Hunter and Pivarnik, JJ., concur.

NOTE.—Reported at 367 N.E.2d 1376.