JAMES PHILLIPS *v.* STATE OF INDIANA.

[No. 577S315. Filed June 20, 1978. Rehearing denied August 9, 1978.]

*Robert W. Hammerle,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Daniel Lee Pflum,* Deputy Attorney General, for appellee.

PRENTICE, J.—Defendant (Appellant) was charged by indictment with First Degree Murder. After trial by jury, he was found guilty of the lesser included offense of Second Degree Murder, Ind. Code § 35-1-54-1 (Burns 1975), and was sentenced to be imprisoned for not less than ten, nor more than twenty-five years. This direct appeal presents the following issues:

(1) Whether the procedure used to select the jury array discriminated upon the basis of wealth.

(2) Whether calling the regular panel of jurors, in an order differing from the order in which they were originally selected by the County Clerk, prejudiced Defendant's trial rights.

(3) Whether the trial court's practice of excusing jurors from service was an abuse of discretion.

(4) Whether certain comments made to members of the jury by the court's bailiff was fundamental error.

(5) Whether it was error to direct the alternate juror to retire with the jury during deliberations.

(6) Whether the evidence was sufficient to sustain the verdict.

## ISSUES I, II, III

The method of selecting the jury array which Defendant objects to has been considered by this Court on prior occasions and upheld. *See*: *Holt* v. *State*, (1977) 266 Ind. 586, 365 N.E.2d 1209; *Brown* v. *State*, (1977) 266 Ind. 82, 360 N.E.2d 830. The procedure employed by Judge Jacobs involved sending questionnaires to approximately one thousand individuals whose names were drawn at random by the County Clerk. The questionnaire provided space to state reasons to be excluded from jury duty, and Judge Jacobs invariably excused any prospective juror who wished to be excused. Consequently, of the one thousand individuals to whom questionnaires were sent, approximately one hundred sixty individuals were available for jury duty. These one hundred sixty

individuals were divided into groups of equal number from which the petit juries were selected. No individual was required to serve more often than he wished during the term, and as a result, the members of the array called to serve on a particular petit jury were not called in the same sequence as they were drawn by the County Clerk.

It is clear that the procedure that was followed which resulted in a substantial number of members of the array being called to serve in a sequence other than that in which they were originally drawn by the County Clerk was a technical violation of Ind. Code § 33-15-22-1 (Burns 1975). However, Ind. Code § 33-15-22-2 (Burns 1975) provides:

> "This act shall be construed liberally, to the effect that no indictment shall be quashed, and no trial, judgment, order or proceeding shall be reversed or held invalid on the ground that the terms of this act have not been followed, unless it shall appear that such noncompliance was either in bad faith or was objected to promptly upon the discovery and *was probably harmful to the substantial rights of the objecting party*." (Emphasis added)

The whole object of the jury selection procedure provided for in Ind. Code § 33-15-22-1 is to assure that jurors are chosen on a random basis, in order to avoid even the possibility of bias. The requirement that jurors be called to serve in the same order as they are originally picked by the County Clerk is to prevent the process of selection by random from being subverted by the placing of individuals or groups of individuals at the end of the list, where they might not be called for service. Here, it is apparent that the members of the array were out of their original order by reason of Judge Jacobs' policy of allowing members to serve according to their convenience. Defendant made no allegation, and there is no indication appearing in the record, that the selection process employed involved the intentional arrangement or rearrangement of prospective jurors in any particular order, and it does not appear that

the defendant could have suffered any impairment of a substantial right.

The defendant further objected to the jury array upon the ground that Judge Jacobs' liberal policy of excusing jurors from service discriminated against wage earners, and thereby excluded low income groups from service. It is clear that the Sixth and the Fourteenth Amendments to the United States Constitution require the States to select juries from arrays which represent a fair cross section of the community. *Taylor* v. *Louisiana*, (1975) 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690; *Duncan* v. *Louisiana*, (1968) 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491. However, as it was stated in *Taylor* v. *Louisiana, supra*:

> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, Fay v. New York, 332 U.S. 261, 284, 91 L.Ed. 2043, 67 S.Ct. 1613 (1947); Apodaca v. Oregon, 406 U.S. 413, 32 L.Ed.2d 184, 92 S.Ct. 1628 (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. 522, 538.

Neither logic nor the evidence supports Defendant's claim that low income groups were systematically excluded from jury service. Defendant's argument is that those individuals who were unable to serve without encountering a financial burden would seek to be and would be excused and that, therefore, persons from the wage-earner strata of the community would be excluded. It seems reasonable, however, that the unemployed, a low income group, would be willing to serve, since it would entail no sacrifice. Further, the evidence presented goes only to the financial status of those jurors who were available for service, and does not reflect the actual

financial condition of those prospective jurors who were excused from service. The defendant failed to show any systematic exclusion which would be in violation of the Sixth Amendment.

## ISSUE IV

The defendant assigned as error certain alleged indiscreet comments made by the court's bailiff to one of the jurors. The comments made by the bailiff related to his assessment of defense counsel's professional capabilities, which was favorable, and speculation as to the content of his argument. The exchange of such comments between an officer of the court and a member of a jury during the course of a trial is highly improper, but in this instance it does not appear to have been prejudicial to Defendant's right to a fair and impartial trial.

Further, Defendant failed to make a timely objection or a motion for mistrial. He argues upon appeal that the conduct complained of was fundamental error and that, therefore, the correct in-trial procedure was not a prerequisite to presentation of the issue upon appeal. But, as stated in *Webb* v. *State*, (1972) 259 Ind. 101, 284 N.E.2d 812, a reviewing court should be reluctant to invoke the rule of fundamental error, and will do so only when a blatant error has occurred which would, otherwise, deny a defendant fundamental due process.

## ISSUE V

As part of the final instructions to the jury, the court directed the alternate juror to retire with the jury and to listen to the deliberations, but not to participate in the deliberations and not to vote. Defendant objected.

In *Johnson* v. *State*, (1977) 267 Ind. 256, 369 N.E.2d 623, the practice of allowing an alternate juror to retire with the regular jurors was expressly approved. We decline the defendant's suggestion to reverse that decision.

## ISSUE VI

The evidence most favorable to the State indicates that the defendant had been beaten during a fight in a tavern. He left the tavern for a short time, and returned with a knife. He then threatened several people with the knife and stated that he was looking for the people who had assaulted him earlier. With the knife in view, he approached the decedent and asked him if he knew where they were.

The decedent then left the tavern, ran around to one side, and returned with a stick. The defendant exited from the tavern and started arguing with the decedent. He was overheard demanding information concerning the people he sought. The decedent denied any knowledge of their location, and the defendant responed, "Yes you do, if you don't tell me where they are I'm going to kill you." The decedent hit the defendant with the stick, but the stick broke. The defendant then stabbed the decedent to death.

On the basis of *Shutt* v. *State,* (1977) 267 Ind. 110, 367 N.E.2d 1376, Defendant argues that no reasonable man deliberating upon the evidence presented at trial could find, beyond a reasonable doubt, that the defendant was not motivated by a sudden, overwhelming passion. On appeal, this Court will look only to the evidence most favorable to the State, with all reasonable inferences to be drawn therefrom, and will not reweigh the evidence or judge the credibility of the witnesses. *Mitchell* v. *State,* (1977) 266 Ind. 656, 366 N.E.2d 183; *Strickland* v. *State,* (1977) 265 Ind. 664, 359 N.E.2d 244.

The case at hand is a far cry from the situation which was presented in *Shutt, supra.* In *Shutt,* the defendant was forced into a confrontation which he had sincerely attempted to avoid. Here, however the evidence clearly established that the defendant was the aggressor. Evidence of malice, which was lacking in *Shutt,* was evidenced not only by the use of a deadly weapon but also by the

defendant's course of conduct and the comments he made prior to killing the decedent.

The evidence supports the jury's verdict of guilty for Second Degree Murder, and the judgment of the trial court is affirmed.

Givan, C.J., and DeBruler, Hunter and Pivarnik, JJ., concur.

NOTE.—Reported at 376 N.E.2d 1143.