Ricky A. MILLER, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 279S50.

Supreme Court of Indiana.

July 6, 1982.

Martin & Wharry, Lebanon, for appellant.

Theodore L. Sendak, Atty. Gen., Gregory Alan Clark, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted by jury of Rape While Armed with a Deadly Weapon, a Class A Felony, Ind.Code § 35–42–4–1 (Burns 1979), and was sentenced to thirty (30) years imprisonment. His defense was "consent." Because of two evidentiary harpoons which were deliberately thrust and, in the context of the case had a very high potential for influencing the verdict, we reverse the judgment of the trial court and direct that a new trial be granted.

It is a cardinal rule of our appellate review that when the verdict is challenged as not being sustained by the evidence, we

consider only the evidence and reasonable inferences therefrom that are favorable to the verdict; and in such cases we will not weigh the evidence or determine the credibility of the witnesses. *Loyd v. State*, (1980) Ind., 398 N.E.2d 1260, 1264, *cert. denied*, 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105. *Gaddis v. State*, (1969) 253 Ind. 73, 75, 251 N.E.2d 658. In that context, we would not give the lengthy recitation of evidence that follows. The prosecutrix testified that she was compelled to have sexual intercourse with the defendant by force and threats of force, and he testified that the episode was consensual. Thus, notwithstanding other evidence, it probably could not be said that the testimony of the prosecutrix was so incredible as to be unworthy of belief by a reasonable person, and it lay within the province of the jury alone to determine which it would believe and which it would disbelieve.

When, as here, however, there has been error in the admission of evidence, we are required to determine whether or not such error was harmful. *Dickerson v. State*, (1972) 257 Ind. 562, 276 N.E.2d 845, *Scott v. State*, (1973) 260 Ind. 67, 292 N.E.2d 252.

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, * * * *. But if one cannot say, with fair assurance, *after pondering all that happened* without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result*, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." (Emphasis added) *Kotteakos v. United States*, (1946) 328 U.S. 750, 764–67, 66 S.Ct. 1239, 1247–49, 90 L.Ed. 1557, 1566–67.

When, as in the case before us, the verdict is dependent, in such a large part, upon the jury's assessment of the credibility of the witnesses and the error bears heavily upon that credibility, determining whether or not the error was harmful may require a weighing of the evidence and an assessment of credibility—not with a view of redetermining the sufficiency of the evidence to sustain the verdict but rather, to assess the potential of the error for influencing the verdict.

The trio central to the scenario had been acquainted two or three years previously. They were citizen band radio hobbyists and the two men were truck drivers and had once worked for the same employer. The defendant testified that he had spoken to the prosecutrix, Jeannette, by radio on a number of occasions in the past and that she had invited him to come for coffee. She denied this, although she acknowledged that she had spoken to him on perhaps two or three occasions when he had called for her husband, Randy. Defendant and Jeannette had met, in person, only once and that was two or three years earlier at a social gathering of C.B. enthusiasts.

At mid-afternoon on February 25, 1978, the defendant appeared at the home of the couple in Bourbon in search of Randy, who was not then at home, and Jeannette invited him in to wait. They visited in the family home and talked about various things, such as the men's having previously worked together, Randy's recently terminated employment as a long distance truck driver and Defendant's recent return from a brief residency in California. Defendant also mentioned that he had had domestic troubles with his wife and told of being separated from her and of have gone to California to get away from some trouble—two different instances of assault and battery, one upon his wife.

During the visit, the couple's four children, ages eight months to six and one-half years were taking naps in the upstairs bedroom. After thirty or forty-five minutes of small talk, the defendant departed, saying that he was going to a nearby tavern and that he might return, if he did not see

Randy there. Jeannette said that she would tell him that he had called.

Randy returned at about 6:00 p. m., and Jeannette told him of Defendant's call and of their visit. The family had supper together, after which she bathed and changed her clothes and put the children to bed at their customary bedtime which was 7:30 or 8:00 p. m.

At about 8:30 p. m., Randy left to look for someone to assist him with a driving job. Between 9:00 and 9:30 p. m., the defendant appeared again, and Jeannette invited him inside, as her husband had instructed. Defendant requested a beer, and she got one from the refrigerator. At his request, she directed him to the bathroom, which was located on the first floor of the home, and, after a brief period in there, he called for help, saying that he had fallen into the bathtub and had hurt his back. Jeannette went to his aid and assisted him to extricate himself.

Between 10:15 and 10:30 p. m., Randy returned. He was accompanied by his friend Jim, who was driving, and three teen-aged youths, Pete, Laurie and Tammy. As the automobile stopped at the front of the house, Randy noticed the defendant's automobile parked in front of his home, and as he exited from Jim's car, he saw the defendant stepping off the porch, and he called to him. Defendant made no response, and he called again. Defendant made an inaudible reply, but hurriedly entered his automobile and departed.

As Defendant was leaving, Randy's attention was attracted to the front door of his home. Through the window of the door, he could see Jeannette, who was inside the house. She was in a rage, beating on the door and yelling "Ran, stop him. Stop him." Randy ran to the door, but it was locked. Jeanette continued to scream excitedly and said that the defendant had raped her. She was nude but had wrapped a blanket around herself.

Randy ran to his automobile, told the others to stay with Jeannette and drove away in pursuit of the defendant. After a chase of about four miles, he caught up to him where he had stopped in a snow covered driveway. He parked his vehicle against the defendant's so that he could not escape, and the two men fought briefly, with Randy accusing the defendant of raping Jeannette and the defendant protesting that the event had been with her consent. Randy wrestled the defendant to the ground, but the defendant was holding his arms, and the match came to a "stand-off." Randy got up to leave and warned that he was going to report the matter to the police.

When Randy attempted to drive away in his automobile, the vehicle wheels could not get traction. Tempers had cooled somewhat by then, and the defendant helped him to get the automobile moving. Randy, then entertaining some doubts, said to the defendant that if he was wrong in accusing him, he was sorry but that he did not believe that he was wrong.

Randy returned home. Jeannette was still hysterical and did not want to talk about the event. He said that he was going to the police, and she protested, saying that she did not think she could talk to them and take the embarrassment. He then asked her how the defendant had been able to do it, and she replied that he had held a knife at her throat. With that, Randy went to the town police department.

Laurie and Tammy, the two teen-aged girls who had arrived with Randy, stayed with Jeannette for about one-half hour. Laurie testified that, except for two brief intervals of several minutes each, she had been in Jeannette's presence throughout this period. Jeannette had told her that "she thought that he—she saw him throw a knife when he went to walk out the door." So she, Laurie, went outside once and looked for it. On the other occasion, Jeannette had gone alone to the bathroom. Laurie also testified that Tammy had gone outside once and looked for the knife and had gone another time to summon Judy Hodges, who had been Jeannette's close friend for many years.

Judy Hodges testified that she is thirty-two years old and that she and Jeannette are very close friends, although she is nine

years older. They had known each other since Jeannette was ten years old and had "run around" together since she was twenty-five and Jeannette was sixteen. "Let's see. I was either just getting my divorce or was divorced at the time.", Judy's testimony continued. She arrived while Randy was out to report the incident to the police, and she was present when the police arrived. Her son, Pete, and his friend, Phil, were also there. While the police were interviewing Jeannette, Judy and Phil went outside and "started walking around through the snow to see if we could find" the knife which Jeannette had said the defendant had thrown. Judy found the knife, in plain view, lying on top of the snow. "I hollered at Phil and I says 'Phil, I found the knife,' I says 'go get the cops.'"

Officer West, who was one of the investigators at the scene, testified that he responded to Phil's call, went outside and viewed the knife where it had been found by Judy. It was lying on top of the snow where it had made only a slight indentation "where it hit the bank and just slid down oh, about two or three inches." He further testified that because of the front wall of the house and the porch roof, the knife could not have been thrown from the area of the doorway to the spot where it was found. The knife was photographed where it lay, carefully picked up and placed in an envelope which was then stapled in such manner as to prevent the knife from moving about inside. The knife, so secured, was then sent to the Indiana State Police Laboratory to be checked for fingerprints. It bore none.

Jeannette was taken to the local hospital and given a general physical and gynecological examination. A written report of the examination was entered into evidence by stipulation. It revealed that motile sperm had been found, but neither bruises, abrasions nor lacerations had been found on any external area of her body or in any body cavity.

The foregoing related evidence is not in dispute, and most of it can be reconciled with the testimony of both Jeannette and the defendant. Their testimony concerning the events that transpired between the time she helped him out of the bathtub and the time of his hasty exit from the house, however, are irreconcilable.

### JEANNETTE'S TESTIMONY

She is almost twenty-four years old but was twenty-three at the time of the rape, six months earlier. She was married to her present husband, Randy, when she was sixteen, at which time she was five months pregnant by him. She has since had three more children by him. They have never been separated except for a year that he had spent in jail upon a conviction for theft.

When the defendant arrived between 9:00 and 9:30 that evening, the children were asleep upstairs. The family dog, a five year old Doberman, was either in the living room or the downstairs bedroom. Jeannette invited him in and he sat down by the door. He asked for a beer, and she got one for him from the kitchen. He said that he had been at his sister's house eating pizza and that he had also had "a couple of hits of acid."

After going to the bathroom, the defendant called for help. Jeannette asked if he was "decent" and then entered. She found him on his back in the tub. She took ahold of his arm, and he got out. Then he grabbed her around the waist and asked if she "fooled around," which she took to mean to go out with men other than her husband. She said that she did not, and he replied that was not what he heard. She then said that she did not care what he heard and that he should leave. They then went through the dining room and into the connecting living room. Defendant was then acting differently than he had in the afternoon. He acted excited. Jeannette told him how to get to Watkins, where her husband was, and he said that he would leave after he smoked a cigarette. He asked for a light for his cigarette, but her Bic lighter was not working properly, and she told him that he could light his cigarette from the kitchen stove.

Defendant went through the dining room into the connecting kitchen, and Jeannette

heard him operating the stove control buttons and then heard the silverware drawer, in which she kept a small butcher knife, being opened. She was still trying to ignite the lighter, and it worked, so she went into the kitchen and lit his cigarette. Then she walked to the stove to turn it off, and when she turned around, the defendant was standing in the doorway to the dining room and had the knife in his hand. She told him to put the knife away, but he said "No" and for her to remove her clothes.

Jeannette told him "no" and to "get the hell out." She tried to go past him, but he pushed her back and held the knife at her stomach. He then ordered her to remove her clothing and she said "no" and tried to pass him. This time he pushed her against the back door and placed the knife at her throat and told her that he was tired of "messing around and to take my clothes off or he was going to use it."

Jeannette screamed for the dog but she did not come. She "hollered again," but the dog did not come. Neither were the children awakened. Defendant said that if the dog came he would cut its throat, so she did not call it anymore. She pleaded with him to leave and said that if he did she would not tell anybody. He put the knife against her throat and pushed on it until it hurt her, so she tried to kick him in the groin with her knee, but he blocked the attempt. Then she pushed him away and attempted to go out the back door, but as she was removing the security chain, he grabbed her arm from behind her back and again demanded that she remove her clothing.

Jeannette was wearing denim slacks, a long sleeved turtle neck sweater, underpants and a brassiere. She removed the slacks and underpants; and with the knife in one hand while holding her arm behind her back with the other, Defendant threw her to the floor. She fell "pretty hard" onto her "rear" and he started to remove his clothes. Jeannette continued to resist and tried to get up, but Defendant removed his pants and got on top of her but he did not have an erection at that time. She told

him that her back was hurting, thinking that she could escape if she could get up. But with the knife at her throat and her arm held behind her back, Defendant led her into the bedroom. "I tried to run for the door but every time that I did, he grabbed my arm harder and put the knife closer."

When Defendant got Jeannette into the bedroom, he was clad only in his shirt and she in her turtle neck sweater and brassiere. He removed his shirt, and then without letting go of the knife, he removed her sweater and brassiere. She again pleaded to be left alone and promised that she would not tell anybody, but he said "no" that he knew Randy would kill him anyhow so he might as well have his fun.

Defendant then made Jeannette sit on the bed and took her head and forced her to place her mouth upon his penis. She started to bite him, and he let her up. He still did not have an erection. Then he threw her upon the bed and performed cunnilingus upon her, and she started screaming and moving, "so he just got on top of me." She continued to resist physically and verbally but he had the knife in his hand throughout the episode and "runs the knife up to my side and tells me to hold still and I keep moving. I keep trying to get away from him, but I can't."

After Defendant penetrated her and had an orgasm, he raised his body from hers, and Jeannette grabbed a blanket and draped it around her. With knife still in hand, "he made me *follow* him to the kitchen to get his clothes because he was afraid I would kill him." (Emphasis added). He dressed in the kitchen and then, "he made me *follow* him to the front door and he asked me again if I hated him." (Emphasis added).

The defendant exited through the front door, and Jeannette locked it. He still had the knife with him. After he got outside and she got the door locked, Randy and his friends arrived in his friends' automobile and stopped behind the family automobile which was parked in front of the house. Defendant was "standing by our car."

Next, the door of the newly arrived vehicle opened and Jeannette saw that it was her husband. Then, she looked and saw the defendant throw the knife at the south side of the house and walk to his automobile and Randy stepping out of his friends' automobile. She began screaming for him and beating upon the door. When he arrived at the door, she at first could not get it unlocked, but then she did. Randy grabbed her and shook her, and she told him that she had been raped.

On cross-examination, in response to counsel's inquiry as to what her husband's attitude would be with regard to a voluntary act of extra-marital sexual intercourse by her, Jeannette responded that he would have to ask her husband but acknowledged that she thought that he would object to it and that it could ruin her marriage.

### DEFENDANT'S STORY

He is a local resident, a truck driver, has been married for nine and one-half years and is the father of three children, ages six, eight and nine years. He might have drunk as many as seven beers during the afternoon and early evening prior to going to Randy's and Jeannette's home. She invited him in and said that Randy would be right back. She offered him a beer and he accepted it. When he went to the bathroom, he slipped on a wet floor and fell into the tub and hurt his back. At his call, Jeannette came and helped him.

He went into the dining room, and asked her to light his cigarette. She said that her lighter was not working and for him to light it from the kitchen stove. He went into the kitchen and turned on the stove; however he could not get it to heat, so he started back through the dining room into the living room. Jeannette went into the kitchen, turned on the stove, and they met in the dining room as she came out of the kitchen. It was there that he kissed her for the first time; and she kissed him.

"A. Well, one thing just kept leading to another and I unsnapped her pants and unzipped them and we both helped her get out of them.

"Q. Then what did you do?

"A. Well, we laid on the kitchen floor and she said that the floor was hard and it was hurting her back. So then we moved to the bedroom. And that is where we finished up at.

"Q. Alright, then what happened?

"A. Well, after it was over with—the intercourse—I was pulling my pants up and snapping up my shirt. I had a snap-on shirt. She told me that I had better be leaving, because Randy would be home at any time. And as I was leaving, Randy was coming home.

"Q. Alright, now you get up and leave. You go to the door?

"A. Yes.

"Q. What does she do?

"A. She grabbed a blanket or sheet or bedspread from the bed and wrapped around her.

"Q. Does she go to the door with you?

"A. She walked out to the living room with me.

"Q. Alright and as you are leaving the door—well strike that. When do you see Randy?

"A. As I was stepping down from the porch.

"Q. Okay and what do you do?

"A. I just kept on walking towards my car.

"Q. And do you hear him yelling something?

"A. He said something to me, but I don't actually recall what it was. He said something like, what are you doing here or—you know and that.

"Q. And what did you do?

"A. Nothing. I just kept walking towards my car.

"Q. Then you got in your car and where did you go?

"A. I went out to my sister's house."

## ADDITIONAL EVIDENCE

The written statement given by Jeannette to the police during the course of their investigation was introduced into evidence; and Defendant's statement given verbally was related by the officer. Their statements were at slight variances from their testimony; the discrepancies, however, are not material, and we believe did not reflect unfavorably upon the credibility of either.

Photographic evidence introduced disclosed several facts worthy of note. State's Exhibit No. 15 depicts the cigarette lighter of the type described by Jeannette lying on the bedroom floor. Her testimony was that she used the lighter in the kitchen immediately prior to her being attacked. State's Exhibit Nos. 2, 3 and 4 show two partially filled beer bottles on the kitchen table. Her testimony was that she gave the defendant only one beer and that she drank none. She also speculated that her husband might have drunk from one of the bottles before he left. State's Exhibit No. 3 shows the back door through which Jeannette testified she attempted to escape. The record of her testimony is not crystal clear, but apparently she said she was thwarted when she was unable to disengage the security chain. The photograph, however, discloses that the chain was not engaged.

State's Exhibits Nos. 2, 3 and 4 depict Jeannette's slacks and underpants draped over the back of one of the kitchen chairs. Exhibit No. 4 also shows a pair of moccasins on the floor nearby, one stacked neatly on top of the other.

Exhibit No. 3 is a view of the kitchen table, four matching chairs and the back door. The room is small. There is barely room to pass between one wall and the table to exit through the door. The furniture is of light to moderate weight tubular construction. The four chairs are neatly positioned at the four sides of the table. There is no disorder to evidence that a lengthy and intense struggle had just occurred there.

## ANALYSIS

In a case of this nature, the relative credibility of the prosecutrix and the defendant is likely to be the factor that determines the verdict, clearly the circumstantial evidence hereinbefore recited was consistent with the defendant's claim. The jury's assessment of Defendant's credibility, therefore, was critical. Under such circumstances, the importance of sheltering the jury from exposure to evidence that was irrelevant to the issues but, nevertheless reflected unfavorably upon his general moral character and, hence, tends to prejudice it against him is self evident. The avoidance of evidence intended to create such bias is one of the reasons for the recent enactment of the rape-shield statute, Ind. Code § 35–1–32.5–1.

## ERRORS

Over defense objections, during presentation of the State's evidence in chief, the State was permitted to introduce Exhibit No. 13, a photograph of the defendant. As contended by the State, it was not a typical mug shot, but it had been obtained from the Fulton County Sheriff's Department, had not been taken in conjunction with his arrest for the crime for which he was on trial, was readily identifiable as a police record and was placed in evidence without any attempt to obscure the objectionable identifiable data. It was a plain, black and white, full face view photograph with no numerals exhibited on the face. On the reverse side, however, which was in no way obscured, the following appeared:

"Property FCSD
Taken 9–12–76
Rickey A. Miller
4–26–52 DOB
316–52–8309 SS
Identified in picture line up by
 /S/ _____ _____." (prosecutrix)

The exhibit was identified by Jeannette as a photograph of the defendant which she had selected from a photographic array at the Bourbon Police Department a few days after the incident. She had previously identified him at the trial, and it had been

admitted in defense counsel's opening statement that he admitted the act of intercourse and that his defense was consent.

Following identification of the exhibit, but before its introduction into evidence, counsel asked her if it reflected the appearance of the defendant as he appeared at the time of the alleged rape, and she replied, "Similar."

"Q. All Right. In what way is it similar?

"A. I just know that that's his face."

In response to a defense objection that the exhibit was a mug shot and therefore prejudicial and further of no evidential value since identification was not in issue, the prosecutor stated that its purpose was to reflect that the exhibit more closely resembled his appearance on the night of the incident than did his current appearance. The Exhibit was admitted and passed among the jurors. It was clearly identifiable as a photograph taken from police files and evidenced that the defendant had had involvement with the police prior to the incident for which he stood charged.

 Our standard of review for police file photographs admitted at trial, which had been taken in connection with a different charge, requires the State to prove that the photograph in question is not unduly prejudicial and that it has substantial evidential value independent of other evidence, *Lawrence v. State*, (1980) Ind., 412 N.E.2d 236, 238. The State's contention that the exhibit was offered to evidence Defendant's changed appearance is simply not borne out by the witness' testimony. Further, we are at a loss to see how a change in appearance, if it did in fact exist, was relevant, inasmuch as there was simply no issue of identification. The evidence was clearly irrelevant and had a substantial potential for prejudice, under the circumstances of this case. Its admission was error.

 Over a proper objection that such testimony was irrelevant and would reveal other criminal activity that would prejudice him, Jeannette was permitted to relate that during the afternoon visit preceding the incident, the defendant had told her of having gone to California to avoid prosecution on two charges of assault and battery, one of which involved his wife. We agree that the evidence was irrelevant and highly prejudicial.

 Generally, evidence of criminal activity, other than that charged, is inadmissible on the question of guilt. However, such evidence may be admitted to show intent, motive, purpose, identification, or common scheme or plan. *Cobbs v. State*, (1975) 264 Ind. 60, 62, 338 N.E.2d 632, 633. Even if the evidence is relevant to one of these issues, it may be excluded if it misleads the jury or serves no other purpose than to prejudice the defendant in the mind of the jury. *Id.* at 62 n. 1, 338 N.E.2d at 633 n. 1 (cases cited therein); *Lawrence v. State*, (1972) 259 Ind. 306, 310, 286 N.E.2d 830, 832.

The State contends that the evidence was relevant to the issue of consent and asserts that knowledge that the defendant assaulted his wife would naturally have placed Jeannette in fear and that the reference to the assault was " * * * only an incidental burden which was minimized by the prosecutor's severely limiting his inquiry into this area." Despite the "limited inquiry," the effect of that inquiry most certainly was not overlooked by the State in its closing argument:

"Does that ring a bell with you? That trip to California. You remember any conversation that Jeannette related about the things that Ricky had told her that afternoon about why he had gone to California? What it was that had prompted that trip."

In *Meeks v. State*, (1968) 249 Ind. 659, 234 N.E.2d 629, we reversed a conviction for rape where a witness testified over objection that the defendant had had carnal knowledge of her by force approximately thirty-five (35) days prior to the offense charged. We quoted approvingly from *Lovely v. United States*, (4th Cir. 1948) 169 F.2d 386, 390 as follows:

"Until the accused admitted the intercourse with the prosecutrix, the issue in the case was two fold, whether he had

had carnal knowledge of her, and if so, whether it was forcibly and against her will. After he admitted the intercourse, there was only the issue of consent. At no time was there any question of assault with intent. The accused was either guilty of rape or not guilty; and his case should not have been prejudiced by evidence of a crime committed against another woman, on the theory that it might show the intent of an assault not accompanied by rape, when no one contended that any such assault had occurred."

We stated further that:

"An individual on trial for a sexual offense should be afforded the same evidentiary safeguards against irrelevant prejudicial testimony as an individual on trial for another felony." 249 Ind. at 664, 234 N.E.2d at 632.

We have stated that *Meeks* stands for the proposition " * * * that evidence of prior crimes is inadmissible in rape cases where the act charged has been proved or admitted and the only issue concerns the consent of the prosecutrix." *Woods v. State*, (1968) 250 Ind. 132, 143, 235 N.E.2d 479, 486. In subsequent cases we limited the holding in *Meeks* to rape prosecutions in which the defendant interposed a defense of consent. *Austin v. State*, (1974) 262 Ind. 529, 531, 319 N.E.2d 130, 132, *cert. denied*, (1975) 421 U.S. 1012, 95 S.Ct. 2417, 44 L.Ed.2d 680; *Miller v. State*, (1971) 256 Ind. 296, 299, 268 N.E.2d 299, 301; *Kerlin v. State*, (1970) 255 Ind. 420, 424–25, 265 N.E.2d 22, 25. *See Merry v. State*, (1975) 166 Ind.App. 199, 219–20, 335 N.E.2d 249, 261–62.

Even if we were to relax the rule of *Meeks*, the State has not convinced us that the defendant's prior activity was relevant to the issue of consent. *See Montgomery v. State*, (1980) Ind., 412 N.E.2d 793, 795–96 (rape and kidnapping convictions reversed where fourteen year old witness related instance of consensual sexual intercourse between herself and Defendant that occurred six weeks prior to the offense charged); *Duvose v. State*, (1971) 257 Ind. 450, 275 N.E.2d 536 (rape and kidnapping convictions reversed where no showing of relevance of police officer's statement that the defendant raped two other women in Pennsylvania); *Burns v. State*, (1970) 255 Ind. 1, 7–8, 260 N.E.2d 559, 562–63 (involuntary manslaughter and reckless homicide convictions reversed where no showing of relevance of record containing defendant's prior instances of drunk driving and reckless driving).

In the case before us, the only issue that the jury was to determine was whether or not the defendant used force or the threat of force to induce the prosecutrix to have sexual intercourse with him. In view of her testimony that he placed a knife forcefully against her throat, twisted her arm behind her back and threw her to the kitchen floor, we do not believe, as the State would have us to do, that the jury could have believed that her fear was induced by the story that he had casually related to her some six hours earlier.

It is clear to us that the police file photograph and the evidence of Defendant's prior brush with the law was offered for the purpose of tarnishing his image in a case that hinged entirely upon his credibility. It also appears likely that such improper evidence had its desired effect. We cannot permit such a conviction to stand. Accordingly, the judgment of the trial court is reversed and the cause is remanded for a new trial.

GIVAN, C. J., and HUNTER, J., concur.

DeBRULER, J., dissents with opinion in which PIVARNIK, J., concurs.

DeBRULER, Justice, dissenting.

Jeannette, the alleged victim, was permitted to testify over objection that appellant, during his first visit to her residence six hours before the attack, told her that he had been into trouble with assault and battery in relation to fights with his wife and another person. In my view, the ruling of the trial court permitting this testimony was not error. Appellant's admission was part of a conversation which was closely related to the rape charged, and which completes the story of the crime on trial by

proving its immediate context. McCormick, Evidence § 190; *Maldonado v. State*, (1976) 265 Ind. 492, 355 N.E.2d 843. The inference, if any, arising from the statement on the back of appellant's photograph, would have the same import, namely, that appellant had had a prior unspecified brush with the law. It can be said therefore, with "fair assurance" that any error in permitting the introduction of the photograph because it revealed some past criminal conduct, did not affect appellant's substantial rights. *Kotteakos v. United States*, (1946) 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

I therefore vote to affirm the conviction.

PIVARNIK, J., concurs.