James Rufus **LOYD**, Jr., Appellant (Defendant Below),

v.

**STATE of Indiana**, Appellee (Plaintiff Below).

No 976S295.

Supreme Court of Indiana.

Jan. 11, 1980.

Rehearing Denied April 25, 1980.

Robert F. Hellmann, William G. Smock, Terre Haute, for appellant.

Theodore L. Sendak, Atty. Gen., David T. O'Malia, Deputy, Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was charged by information with two counts of first degree murder, Ind.Code § 35–13–4–1 (Burns 1975). Following a trial by jury, Defendant was found guilty on both counts, and was sentenced to two terms of life imprisonment. This direct appeal presents the following issues:

(1) If there was sufficient evidence of guilt to sustain the convictions.

(2) Whether the trial court erred by denying defendant's motion for discharge pursuant to Ind.R.Crim.P. 4(B), when Defendant had not been brought to trial after seventy days following his motion for an early trial.

(3) If the trial court committed error by refusing to discharge Defendant pursuant to Ind.R.Crim.P. 4(B) after eighty-eight days following a motion for early trial.

(4) If the trial court erred by discussing the possibility of parole from a life sentence with prospective jurors during voir dire.

(5) Whether the trial court erred by denying Defendant's motion for a new trial premised upon the after trial discovery of evidence which the State had failed to disclose pursuant to the terms of a discovery order.

(6) Whether certain evidence admitted at trial was relevant.

(7) If the trial court committed error by giving a final instruction stating that one must act honestly and conscientiously in order to rightfully claim self-defense.

(8) If the trial court erred by refusing Defendant's tendered final instruction number one, distinguishing second degree murder and manslaughter.

\* \* \* \* \* \*

ISSUE I

The evidence, when viewed most favorable to the State, discloses that on September 29, 1975, the defendant came to the home of Ernest Smith and asked for a gas can. While Defendant was sitting in his truck and talking to Smith, Donald Douglas and Ronnie Robbins arrived. As Douglas and Robbins were talking to Smith, Defendant got out of his truck approached Douglas, and hit him on the head with a handgun. Defendant then turned to Robbins and hit him in the face with the gun. Both Douglas and Robbins ran away from Defendant, and as they were running, Defendant fired his pistol at Douglas, but missed.

Defendant entered his truck and drove away, but he was followed by Douglas and Walter Melvin, who were on foot. Defendant stopped his truck at an intersection and got out to meet Melvin and Douglas. Melvin took a swing at Defendant, but missed when Defendant stepped out of the way. Defendant then hit Melvin with the gun and knocked him down. Douglas lunged

for Defendant's gun, and Defendant shot him. As Melvin was getting up off of the ground, Defendant shot him too. Defendant then entered his truck and drove away.

Both Melvin and Douglas died as a result of the gunshot wounds inflicted by Defendant.

Defendant argues that as he was driving away from the original altercation at Smith's, he was pursued and threatened by Melvin and Douglas. After Defendant met Douglas and Melvin at the intersection, he claims that he attempted to avoid their assault by merely striking one of them before he discharged his handgun. Defendant alleges that the circumstances justified the use of deadly force in self-defense, and that the State failed to present sufficient evidence to refute this claim of self-defense.

■ The rule in Indiana which permits the employment of deadly force in self-defense, requires that one must (1) act without fault, (2) be in a place where he has a right to be, and (3) act in reasonable fear or apprehension of death or great bodily harm, *Banks v. State,* (1971) 257 Ind. 530, 276 N.E.2d 155; *King v. State,* (1968) 249 Ind. 699, 234 N.E.2d 465. A defendant claiming the justification of self-defense need only raise the issue so that a reasonable doubt exists, *Clark v. State,* (1902) 159 Ind. 60, 64 N.E. 589. It is then incumbent upon the State to negate, beyond a reasonable doubt, the presence of one or more of the necessary elements of self-defense, *Johnson v. State,* (1971) 256 Ind. 579, 271 N.E.2d 123.

■ Upon a review for sufficient evidence, this Court will look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If the existence of each element of the crime charged may be found therefrom, beyond a reasonable doubt, the verdict will not be disturbed, *Baum v. State,* (1976) 264 Ind. 421, 345 N.E.2d 831. In such a review, we will not weigh conflicting evidence nor will we judge the credibility of the witnesses, *Rosell v. State,* (1976) 265 Ind. 173, 352 N.E.2d 750.

Here, there was sufficient evidence of probative value from which the jury could find all necessary elements of first degree murder; that defendant purposely and with premeditated malice killed Melvin and Douglas. Furthermore, there was sufficient evidence from which the jury could find, beyond a reasonable doubt, that the defendant did not act in reasonable fear or apprehension of death or great bodily harm.

■ Malice and purpose may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or great bodily harm, *Horton v. State,* (1976) 265 Ind. 393, 354 N.E.2d 242; *White v. State,* (1976) 265 Ind. 32, 349 N.E.2d 156. Although this inference may be rebutted by uncontroverted evidence to the contrary, *Shutt v. State,* (1977) Ind., 367 N.E.2d 1376, here there was evidence that the defendant, immediately prior to the shooting, threatened to kill the decedents and had assaulted Douglas a short time earlier. Prior threats and assaults are evidence of malice and purpose, *Taylor v. State,* (1973) 260 Ind. 264, 295 N.E.2d 600. Such evidence may also establish premeditation. *Dinning v. State,* (1971) 256 Ind. 399, 269 N.E.2d 371.

"(O)ne of the factors necessary to justify killing in self defense is the bona fide fear of death or great bodily harm. *Banks v. State* (1971), 257 Ind. 530, 276 N.E.2d 155. But, whether or not there was such a state of mind must be found objectively in the light of the surrounding circumstances, and the standard for determining that issue is the reasonableness of such belief under the circumstances. Although the burden is upon the State to prove the absence of such belief, since that requires the proof of a negative proposition, the evidence is sufficient, on appeal, if it could be found, beyond a reasonable doubt, that a reasonable man would not have had such fear." *Shutt v. State,* 367 N.E.2d at 1385.

■ Before a person is justified to purposely kill an assailant in self-defense, he must believe that killing is necessary to preserve his own life or to prevent great bodily harm. In this regard, two old Indi-

ana cases went so far as to state that deadly weapons may never be used to repel an attack with fists, *Voght v. State,* (1895) 145 Ind. 12, 43 N.E. 1049; *Smith v. State,* (1895) 142 Ind. 288, 41 N.E. 595. This is no longer the accepted rule, *Hill v. State,* (1937) 212 Ind. 692, 11 N.E.2d 141; *Davis v. State,* (1898) 152 Ind. 34, 51 N.E. 928. Nevertheless, one who is assaulted in a manner that does not appear to threaten great bodily harm may not purposely kill in his self-defense, *Bullard v. State,* (1964) 245 Ind. 190, 195 N.E.2d 856; *Weston v. State,* (1906) 167 Ind. 324, 78 N.E. 1014. The force used to repel an attack must be reasonable and may be used only in the belief that such degree of force is necessary to defend oneself, *White v. State,* (1912) 178 Ind. 317, 99 N.E. 417.

 Even assuming that Defendant had been assaulted and had a right to defend himself, the circumstances disclosed by the evidence in this case are such that the jury could rightfully have found that a reasonable man, in Defendant's place, would not have been in fear of death or great bodily harm, and that the defendant was, therefore, not justified in using deadly force in defense of himself.

## ISSUE II

On October 2, 1975, Defendant filed a motion for an early trial pursuant to Ind.R. Crim.P. 4(B). Trial had originally been set to begin on December 8, 1975, but on November 12, 1975, upon motion of the State, the trial date was changed to December 15, 1975, which was four days beyond the seventy day limitation provided by Ind.R. Crim.P. 4(B). Defendant objected to this trial date upon the ground that it denied him the right to a speedy trial, and he made a motion to be discharged, which was denied.

 Ind.R.Crim.P. 4(B) expressly provides that a criminal defendant shall be discharged if not brought to trial within seventy days following his motion for an early trial, except when the delay is attributable to the defendant or when there is insufficient time due to the congestion of the court calendar. If the delay is made necessary due to the congestion of the court calendar, the court may schedule the trial beyond the seventy day period upon its own motion, *Harris v. State,* (1971) 256 Ind. 464, 269 N.E.2d 537. Here the defendant's trial was scheduled to begin on Monday, December 8th. Another criminal case had been tentatively scheduled to begin on Monday, December 1st, and was expected to continue into the next week and to conflict with the date set for defendant's trial. It was for that reason that the court granted the State's motion and continued Defendant's trial until the following Monday, December 15. The court expressly stated such as being the reason for the continuance, and the delay clearly fell within the exception to the rule.

## ISSUE III

On the morning of December 15, 1975, the day previously scheduled to begin Defendant's trial, the State moved for a continuance due to serious illness in the family of the trial prosecutor assigned to try the case. The motion was granted, and trial was re-scheduled for January 5, 1976. Defendant again objected and moved to be discharged pursuant to Ind.R.Crim.P. 4(B), which motion was denied. On December 29, 1975, eighty-eight days following Defendant's request for an early trial, he again moved to be discharged. This motion was also denied.

 The court calendar may be congested by a variety of circumstances, among them the unavailability of essential personnel or physical facilities. We hold that any exigent circumstances may warrant a reasonable delay beyond the limitations of Ind. R.Crim.P. 4, due deference being given to the defendant's speedy trial rights under the rule. The reasonableness of such delay must be judged in the context of the particular case, and the decision of the trial judge will not be disturbed, except for an abuse of discretion.

It is true that this Court has stated:

"(T)he standard imposed on Indiana courts and prosecutors is stricter than that imposed in the federal system since any delay exceeding the specified time limit is considered a *per se* denial of the 'speedy trial' right." *Fossey v. State,* (1970) 254 Ind. 173, 258 N.E.2d 616.

■■■ From this, the defendant argues that any delay beyond the seventy day period is a *per se* violation of the rule. The exceptions contained in Ind.R.Crim.P. 4(B) and (D) belie this position, however. Defendant's argument is based upon a misreading of the language quoted from *Fossey, supra.* Ind.R.Crim.P. 4(B) is a *per se* rule only in the sense that once a violation is shown to exist, the defendant need not establish actual prejudice. The purpose of Ind.R.Crim.P. 4(B) is to assure a speedy trial. This purpose is well served if the State must bring a defendant to trial within seventy days or show compelling reasons for the failure to do so. The rule was designed to assure criminal defendants of speedy trials, not to provide them with a technical means of avoiding trial. *Utterback v. State,* (1974) 261 Ind. 685, 310 N.E.2d 552.

■■■ Turning to the reasons for the continuance, the record shows that on December 13, 1975, two days prior to the date scheduled for Defendant's trial, the Vigo County Deputy Prosecutor, who was to try the case, learned that his father had just suffered a massive heart attack and that his mother had terminal cancer. In addition to the emotional disability likely to have been produced by such shocking news and rendering a brief continuance reasonable, it was also necessary for him to attend to the emergency needs of his parents in Columbus, Indiana, some 100 miles away. This deputy prosecutor was the sole attorney for the State who was prepared for trial. He had attended all of the depositions which had been taken, and was familiar with the evidence and the testimony that was to be presented by the numerous witnesses for the State. No other attorney in the Vigo County prosecutor's office could reasonably have prepared for trial upon such short notice.

Considering the exigent circumstances related and the brevity of the delay, we are of the opinion that the trial judge acted properly in granting the continuance and denying the motion for discharge.

## ISSUE IV

■■■ During voir dire of prospective jurors, the trial prosecutor inquired whether they could, if the evidence warranted, find the defendant guilty of first degree murder, even though it carried a life sentence. One of the veniremen asked when parole was applicable, and the prosecutor asked the judge if he wanted to speak on that. A colloquy among the judge, the veniremen, the prosecutor and defense counsel transpired from which it was apparent and generally agreed that none was familiar with the statutory provisions pertaining to early release of convicts under life sentences. Ultimately, the judge advised the panel that anyone sent to prison, after he had served a certain amount of time, has a right to go before a parole board. He had previously advised that the parole board had great discretion in the matter and could keep one in for life or release him after a certain period of time. He advised that he could not instruct with regard to the time requirement, because he did not know himself.

The defense counsel moved for a mistrial, which motion was denied. He contends that the jury was led, by the court's comments, to believe that the penalty provided for first degree murder was quite as severe as it seemed upon its face, and that, in consequence, they may have compromised their views upon the issue of guilt or innocence. He cites *Deming v. State,* (1956) 235 Ind. 282, 133 N.E.2d 51. In that case, the trial judge, in response to an inquiry through the Bailiff, during deliberations relayed the message to the jury that the possibilities of parole would be entirely up to the institution, and to that extent the case is very similar to the one before us. However, we did not reverse because of the information imparted but because it was

imparted during trial, was in the nature of an instruction, and *was not given in open court in the presence of the defendant.* "It raised a doubt as to the fairness and impartiality in the deliberations of the jury, therefore 'prejudice may be conclusively presumed.' ", citing *Coolman v. State,* (1904) 163 Ind. 503, 72 N.E. 568.

Defendant has cited us to *Feggins v. State,* (1977) 265 Ind. 674, 359 N.E.2d 517, wherein we set out guidelines for trial courts faced with the necessity of responding to a juror's inquiry concerning parole. The essence of that holding is that the jury should be instructed that it should exclude consideration of parole because the time a sentenced defendant will actually serve is contingent upon future events and cannot be determined with reasonable certainty at the time of trial. It is true that the court did not specifically instruct that the jury should not consider the possibility of parole in its deliberation; however, we are of the opinion that no other inference could have been drawn from the advisements that he did give.

### ISSUE V

Prior to trial, Defendant filed a discovery motion, which was granted, without objection from the State. The motion reads as follows:

"Comes now the defendant and respectfully moves the Court to order the State of Indiana, by and through its Prosecuting Attorney, to furnish to the defendant or his attorney, the following:

\* \* \* \* \* \*

"2. All exculpatory evidence in possession of the State of Indiana or any law enforcement agency.

\* \* \* \* \* \*

"4. All statements made, and a copy of all statements signed by this defendant, the prosecuting witness, and any other witness, including exculpatory witnesses, together with the arrest and conviction records thereof, if any.

\* \* \*."

Subsequent to trial, the defendant discovered a witness to the crime who had given a statement to the police, but the statement had not been disclosed by the State. The witness, Mrs. Downey, had made the following statement to the police:

"Mrs. Downey stated to the undersigned officer that she was with her husband, Leo Downey, on 9–29–75 a little after 6:00 P.M. and they were heading north on 6th Street when they saw two people running around a vacant house just south of Maiden Lane on 6th Street.

"Mrs. Downey stated that she did not hear any shots but after passing 6th & Maiden Lane she looked back and saw a subject fall in the street and at that time she thought these subjects were fighting but she didn't know what exactly was taking place at that time.

"Mrs. Downey stated that she did not recognize anybody at the scene at 6th & Maiden Lane and this is all that she observed. She stated she could not add anything else to this report.

"End of interview."

Defendant claims that the State's failure to disclose this statement violated paragraphs two and four of the discovery order, *supra.* Defendant further alleges that the violation was prejudicial in that the undisclosed statement provided material evidence concerning the necessary element of premeditated malice for the crime of first degree murder.

At trial the trial prosecutor argued that the fact that the defendant stopped his truck, without apparent reason, when he was being chased by the two victims was indicative of premeditated malice. The State suggested that it would be reasonable to infer that the defendant had intended to kill his assailants when he stopped the truck to meet them. Defendant contends that Downey's testimony might have revealed a different reason for Defendant stopping his truck, and suggests that Downey's testimony would show it had been necessary for the defendant to stop his truck because Downey had been traveling on the intersecting street.

Although Downey's statement was not exculpatory on its face, and therefore not discoverable under paragraph two of the discovery order, *supra*, it was discoverable under paragraph four, *supra*. The State's failure to disclose this evidence was a violation of the discovery order.

■ The State suggests that the standard for granting a new trial in the present situation should be the same as the standard used for newly discovered evidence. A party seeking a new trial on the basis of newly discovered evidence must demonstrate:

"(1) that the evidence alleged to be newly discovered could not have been discovered before trial by the exercise of due diligence on behalf of the party seeking the new trial; and

"(2) it must be shown that the newly discovered evidence is of such a nature that had it been admitted at trial, a different verdict would probably have been returned." *McCurdy v. State*, (1975) 263 Ind. 66, 324 N.E.2d 489.

Defendant urges the Court to employ the constitutional standard to determine the occasion for granting a new trial. The test used in *United States v. Agurs*, (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, for determining when a defendant is entitled to a new trial for the State's failure to disclose material evidence is "if the omitted evidence creates a reasonable doubt that did not otherwise exist."

■ Aside from the due diligence proviso of the newly discovered evidence rule, there is no practical distinction between the two tests. If the omitted evidence, when revealed, creates a reasonable doubt that did not otherwise exist, then it is probable that a different verdict would have been returned had such evidence been presented.

Although Defendant alleges that Downey would have testified that Defendant was forced to stop his truck in order to let her pass on the intersecting street, her statement to the police does not so indicate. The defendant included Downey's affidavit in the record:

"Comes now Betty Downey, your affiant, and having been duly sworn upon her oath, states as follows:

"1. That on September 29, 1975, at or about 5:30 P.M., I, along with my husband Leo Downey, were in our automobile traveling in a northerly direction on North 6th Street in Terre Haute, Indiana.

"2. That while so doing, as we approached the intersection of 6th Street and Maiden Lane from the south, I observed Walter Melvin and Donald Douglas come running out from between two houses just south of 6th and Maiden Lane, and then running north along 6th Street on or about the sidewalk on the east side of 6th Street toward the intersection of 6th and Maiden Lane.

"3. That at this time, a U-Haul pickup truck was at a stop at the intersection of 6th and Maiden Lane.

"4. Approximately two to three weeks after the time I made the above observations, I spoke with a detective of the Terre Haute Police Department concerning my observations."

The content of the affidavit is essentially the same as that of the statement to the police, and Defendant's contention that she, Mrs. Downey, would have testified concerning a reason that the defendant stopped his truck is speculative at best.

Testimony of eyewitnesses disclosed that the defendant was in a motor vehicle, which he had stopped at an intersection. The decedents had been on foot and running and shouting after the defendant. The decedents stopped short and continued to shout and wave their arms. The defendant alighted from the vehicle and went around it to meet them. Whether the defendant initially stopped his truck at the intersection for such purpose or in deference to the right-of-way of the Downeys' vehicle appears to be of no significance. In either event, when he was in no danger of physical harm from the decedents and in a position of infinite security, he voluntarily exited and went to confront them, which is consistent with the presence of premeditation and inconsistent with a claim of self defense.

It is also significant that there had been "bad blood" between the defendant and the decedents for some time. On an occasion approximately six months earlier, there had been a confrontation between them and the decedents had taken a gun away from the defendant and struck him, and the defendant said that he would "get" them both.

The homicide occurred at approximately 5:30 p. m. At noon of the same day, the defendant told a mutual acquaintance, Donald Clark, that he was going to kill the decedents.

The foregoing related matters, coupled with defendant's unexplained striking of Douglas and firing a shot at him moments earlier, as Douglas was fleeing, and his shooting of Melvin after having knocked him down and before Melvin was fully erect again belie the claim of self defense. It cannot be said, in view of all the evidence, that the hoped for testimony of Mrs. Downey, even if forthcoming, would have created a reasonable doubt that did not otherwise exist or likely would have produced a different verdict. A new trial, therefore, is not called for under either the rule of *McCurdy v. State, supra*, or *United States v. Agurs, supra*.

### ISSUE VI

■ A State's witness testified on direct examination that the defendant had once jokingly stated that he received money from older women in return for taking them out. Defendant objected to the testimony on the grounds that it was irrelevant and prejudicial. The testimony was obviously irrelevant to the charges of first degree murder for a shooting that occurred two months after Defendant's comment concerning older women, but the testimony objected to by Defendant made it clear that he had spoken in jest. It, therefore, does not appear that the evidence could have been so prejudicial as to require a new trial.

### ISSUE VII

■ Defendant objected to State's instruction number five, dealing with self-defense, and the language contained therein

that, "A person in the exercise of the right of self defense must act honestly and conscientiously." Defendant claims that this language disparages the right of self-defense insofar as it requires an individual to act with cool deliberation when defending his life, contrary to the holding in *Banks v. State,* (1972) 257 Ind. 530, 276 N.E.2d 155, and that it implies that one who is initially at fault may not claim the defense even though he attempts to withdraw from the conflict.

The passage objected to, however, appears in the instruction immediately following language that, "one exercising the right to self defense is required to act the instant, and without time to deliberate and investigate and under such circumstances a danger which exists only in appearance, is as real and imminent to him as if it were actual." Clearly, in this context, the language objected to does not contravene or undermine the ruling in *Banks, supra.* Furthermore, to act "honestly" and "conscientiously" is little different than the requirement to act without fault.

### ISSUE VIII

Finally, Defendant objected to the court's refusal of his tendered final instruction number one, which was as follows:

"No killing in combat which engenders hot blood, however unlawful, can be murder even in the second degree unless the elements of purpose and malice concur in the act. Such a killing may amount to manslaughter but it cannot be murder in either degree."

■ The refusal of an instruction is not grounds for reversal when the substance thereof is adequately covered by other instructions which are given, *Vacendak v. State,* (1976) 264 Ind. 101, 340 N.E.2d 352. Here, the court adequately instructed the jury concerning all lesser included offenses of first degree murder and their respective elements. The court's instruction number one included voluntary manslaughter as an included offense of murder.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.