**Stephen Harold LOY, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 981S236.

Supreme Court of Indiana.

July 8, 1982.

Nile Stanton, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Carmen L. Quintana, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted of Murder, Ind.Code § 35–42–1–1 (Burns 1979), and sentenced to forty-five (45) years imprisonment. This direct appeal presents the following issues.

(1) Whether the trial court erred in admitting two sets of photographic slides into evidence.

(2) Whether the evidence is sufficient to sustain the verdict.

\* \* \*

## ISSUE I

At the Oakwood Trailer Park in the early morning hours of September 6, 1979, the Portland Fire Department extinguished a fire in the trailer of Bruce Lykins. Lykins' nude body was found lying face down in the bedroom. The hands and feet were tied to the bedposts. Debris and burned clothing covered the body. An autopsy revealed that Lykins died of asphyxiation by strangulation and that he was dead before the fire started.

### A.

Over objection, the trial court admitted into evidence thirty-five (35) of thirty-eight (38) photographic slides, Exhibits D–1 to D–22; D–24 to D–31; D–33 to D–37, which depict the scene of the trailer after the fire. The slides appear in the record in the form

of 3″ × 5″ color photographs. They show the extensive damage done by the fire to the exterior of the trailer and to its contents. They also display several views of the deceased's body, as it was found, tied to the bed.

Defendant contends that the slides were irrelevant and inflamed the jury. He argues that arson was not in issue and that the evidence would show that fire was not the cause of death. He asserts that the slides were gruesome and that they displayed every "nook and cranny" of destruction to the trailer, which destruction was not relevant to the issue of the identity of Lykins' assailant.

 The trial court's decision to admit photographs into evidence will be reversed only upon the showing of an abuse of discretion. *Crane v. State*, (1978) 269 Ind. 299, 303, 380 N.E.2d 89, 92. Admissibility involves the photograph's relevance, which may be determined by an inquiry as to whether a witness would be permitted to describe verbally the objects photographed.

 The photographs at issue supplemented the testimony of a police officer who investigated the homicide. The State theorized that Defendant and another individual, whom Lykins may have planned to blackmail, killed Lykins and then set the trailer on fire to conceal the crime. The photographs, along with the officer's testimony, tended to prove the thoroughness and planning with which the perpetrators carried out their deed. They also acquainted the jury with the scene of the crime, which witnesses described. *Vasseur v. State*, (1982) Ind., 430 N.E.2d 1157, 1159; *Kiefer v. State*, (1958) 239 Ind. 103, 108, 153 N.E.2d 899, 900. In prior cases we have allowed the admission of photographs, which showed the scene of the homicide including the body of the deceased, despite their gruesome details. *Drollinger v. State*, (1980) Ind., 408 N.E.2d 1228, 1237; *Bond v. State*, (1980) Ind., 403 N.E.2d 812, 817; *Chambers v. State*, (1979) Ind., 392 N.E.2d 1156, 1160; *Rogers v. State*, (1979) Ind., 383 N.E.2d 1035, 1036; *Crane v. State, supra; Hoover v. State*, (1978) 268 Ind. 566, 571,

376 N.E.2d 1152, 1155–56; *Brandon v. State*, (1978) 268 Ind. 150, 155, 374 N.E.2d 504, 507; *Wilson v. State*, (1978) 268 Ind. 112, 116–17, 374 N.E.2d 45, 48. We find no abuse of discretion in the admission of these photographs.

### B.

Defendant also contends that thirteen (13) photographic slides, Exhibits E–1, E–2, E–4 to E–14, which were admitted over objection and shown to the jury, were irrelevant, gruesome, and inflammatory. The slides appear in the record as 3″ × 5″ color photographs of the autopsy. Defendant asserts that their prejudicial effect is not speculative. After viewing the slides, one juror expressed doubts about her ability to render an impartial decision. It appears from the record that she became emotionally distraught and began to cry when the trial judge discreetly and delicately questioned her about her reaction to the pictures.

In general these photographs are very unpleasant to view. They show the semi-charred remains of the deceased from different angles. They include close-ups of the joints where the rope had bound the body to the bedposts in the trailer. One photograph shows the deceased's head with a hand holding open the eyes.

In particular Exhibits E–13 and E–14 were the most distressing to the juror. E–13 displays the internal body cavity of the deceased. A gloved hand holds the heart which has a tag attached to it. E–14 depicts several internal organs in a tray after they had been removed from the body. Again a gloved hand holds a lung and another hand is placing a card bearing a number and the deceased's surname next to the lung.

The trial court accepted the juror's inability to continue and excused her in favor of the alternate juror. Defendant then moved for a mistrial and renewed his objection concerning the prejudicial and inflammatory effect of the autopsy photographs. The trial court overruled the motion for a mis-

trial and admonished the jury not to allow the excused juror's emotional reaction to influence their consideration of the case.

In *Kiefer v. State, supra,* we reversed a conviction for First Degree Murder where the defendant had been sentenced to death. Over objection the trial court had admitted a photograph of the victim's body taken during the autopsy. The photograph showed the hands of a doctor and a nurse with instruments inside the victim's chest. Another photograph showed the victim's body after the autopsy had been completed. The Court cited and discussed several out of state cases in support of its holding:

"We recognize that photographs of a corpse are admissible in evidence, even though they portray a gruesome spectacle and may arouse passion and resentment against the defendant in the minds of the jury, *but* such photographs must be *material* and *relevant* and *tend to prove or disprove some material fact in issue.* 159 A.L.R.Anno. 1413, at page 1420.

"Photographs which show the body of a deceased during and after the autopsy was performed have been held inadmissible on the theory that they serve no material purpose and their only value is to arouse the emotions of the jury." 239 Ind. at 114, 153 N.E.2d at 903 (emphasis in original).

Since *Kiefer* we have not retreated from this rule. Photographs which showed the deceased's body before the pathologist's dismantling have been held admissible despite their gruesome or gory subject matter. These photographs allowed the jury to see the wounds or trauma inflicted upon the victim, and they were often accompanied by testimony from the pathologist about the cause of death. *Rowan v. State,* (1982) Ind., 431 N.E.2d 805, 816–17; *Owens v. State,* Ind., 431 N.E.2d 108, 111–12; *Akins v. State,* (1981) Ind., 429 N.E.2d 232, 236;

*Webster v. State,* (1981) Ind., 426 N.E.2d 1295, 1298; *Hightower v. State,* (1981) Ind., 422 N.E.2d 1194, 1195–96; *Smith v. State,* (1981) Ind., 420 N.E.2d 1225, 1229; *Drollinger v. State,* (1980) Ind., 408 N.E.2d 1228, 1238; *Bond v. State, supra; Bates v. State,* (1977) 267 Ind. 8, 10–11, 366 N.E.2d 659, 660; *Hewitt v. State,* (1973) 261 Ind. 71, 76–77, 300 N.E.2d 94, 97–98; *Torrence v. State,* (1971) 255 Ind. 618, 621, 266 N.E.2d 1, 3; *New v. State,* (1970) 254 Ind. 307, 310–11, 259 N.E.2d 696, 699. We have noted that the rule of *Kiefer* has limited application, *see Blevins v. State,* (1973) 259 Ind. 618, 624–25, 291 N.E.2d 84, 88 (cases cited therein); however, the graphic portrayal of an autopsy by a photograph or photographs carries the potential for displaying more than the state of the victim's body at the time it was discovered. Such a display may impute the handiwork of the physician to the accused assailant and thereby render the defendant responsible in the minds of the jurors for the cuts, incisions, and indignity of an autopsy.

In this respect we think that the photographs, Exhibits E–13 and E–14, are similar to the autopsy photography in *Warrenburg v. State,* (1973) 260 Ind. 572, 574, 298 N.E.2d 434, 435. In *Warrenburg* we held that it was error to admit most of an autopsy photograph which showed the surgical incisions. The only relevant part of the photograph depicted bruises on the victim's skull. We stressed the difference between a photograph which shows the victim in his/her natural state following death and one which shows the body after it has been altered by an autopsy. The former is relevant and admissible; the latter is not, *Merritt v. State,* (1978) 267 Ind. 460, 464, 37 N.E.2d 382, 384, and Exhibits E–13 and E–14 fall into the second category. Given the photographs' prejudicial impact,[1] *Pat-*

---

1. We note further that Exhibits E–13 and E–14 were at best cumulative of other evidence. Dr. Fossum, the pathologist, arrived at the cause of death after his external examination of the body. At trial he related the extensive scope of that external examination in detail and also explained the process of an autopsy. Then the State showed the doctor Exhibit E–1, the first in the series, whereupon defense counsel objected:

"MR. SHAPPELL: Your Honor I'm going to object to the slide display. The Doctor has already been through every bit of the testimony that is proposed by the exhibit of these slides.

*terson v. State,* (1975) 263 Ind. 55, 61, 324 N.E.2d 482, 486; *Carroll v. State,* (1975) 263 Ind. 696, 709–10, 338 N.E.2d 264, 274 (Prentice, J., concurring), this Court will not set aside the conviction if, after examining all the evidence, it can be said that their admission was harmless. *Warrenburg v. State, supra.*

The only issue in dispute at trial was the identity of the assailant. The State attempted to prove the identity by the testimony of several witnesses.

Debbie Wilson, a neighbor of the Defendant's at the time of the murder, related a conversation she had had with the defendant at her place of employment in September, 1979, some time after the sixth:

"A. Well he just came in and I hadn't seen him for awhile, and I asked him what he'd been doing, and he had told me he had been hiding. And I asked him what he was hiding from, and he told me about the murder in Portland, and that he was wanted for the murder of it. And I was joking with him, and I said, 'Well did you do it?', and he said, 'I don't know. I guess I did if that's what they want me for.' And I, I still took it as a joke. And I said, 'Well I hope not. I don't want a killer living upstairs from me.' And then he had told me that there was another lady in the store I didn't, I don't recall seeing her myself, but he had told her that he killed a man and she ran out of the store. I mean, and I didn't see her or anything, but he had told me that. And then he turned around and left."

Wilson testified that she was joking when she posed the question and that she thought that the defendant's answer was also a joke. The next day Wilson encountered Defendant outside his apartment. Defendant stated that he was going to leave for Florida "pretty soon."

Jefferson Griffin related a conversation he had had with Defendant while they were cellmates at the Jay County Jail. Defendant had stated that he had killed "the son of a bitch" referring to Lykins, and that the police would never prove it because Grimes would not testify against him. Defendant had been to Lykins' trailer on several occasions, and on the night of the murder, he and Grimes had gone to the trailer to rob Lykins. Defendant beat Lykins and then killed him out of Grimes' presence, and then he and Grimes set a fire in the bedroom and took weapons, guns. Defendant again related the incident in jocose fashion:

"Q. What was his demeanor as he was stating this to you? How was he acting when he stated he'd killed Bruce Lykins?

"A. He a jokin about it, eh, grinnin' at it."

Defendant also mentioned an alibi—that he was supposed to be with a girl named Hall on the night of the murder.

Luetta (Jeannie) Hunt, a waitress at the American Bar in Portland related conversations she had overheard on the Saturday after the murder:

"Q. Can you relate to the Jury the statements made by the Defendant on that date at that location that you over heard?

"A. One of em was that, eh, he was in Michigan. Another one that the, eh, he was three hundred miles away. Then, eh, the other one was that him and Grimes was around but that they had no alibi for that, the night that Bruce got killed."

Hunt could not identify the persons with whom Defendant had had these conversations.

The State's key witness was Mary Hall. She was familiar with the defendant and Grimes, having lived with Grimes from November, 1978 until February, 1979. On September 6, 1979 between 1:30 and 2:00 a. m. Defendant and Grimes arrived at her house. Grimes asked to borrow her automobile, a 1966 maroon, two door Chevrolet Impala. She assented but told them that she didn't know "if it had enough gas in it." Both men left in Hall's car and returned

It's completely unneedlessly accumulative (sic) now. He's been through all the testimony." R. at 765.

The record substantiates the facts voiced in the objection.

ten (10) to twenty (20) minutes later, whereupon Grimes asked Hall to drive them somewhere. He gave directions which took them to a point a short distance from the trailer park. Defendant and Grimes, who had a ski mask, "crawled out the window on the passenger side," and Grimes told Hall to go home. She arrived home about 3:15 a. m. and dozed off on the living room couch until Defendant and Grimes returned at some time before 4:00 a. m. Both men were breathing heavily, and Defendant had a green bag which sounded as if it contained metal, when Defendant moved it.

"A. And, eh, then Chuck ask me if I had any cigarettes. So I give him a pack of cigarettes. And then Steve ask what they were gonna do with me.

"Q. Now who'd he say that to?

"A. To Chuck.

"Q. Did Chuck say anything?

"A. No.

"Q. Ok. Then what happened after that?

"A. Then they left."

Hall heard the fire department siren at the time that Grimes left on his motorcycle.

On Friday afternoon, September 7, 1979 Defendant returned to Hall's home:

"Q. Was there anything said by the Defendant as to the activities of the prior evening?

"A. He asked me if, he said I suppose that you've read the papers. And I told him yeah. And then he said that, eh, he hoped that I wouldn't say anything. And I said that I wouldn't because I loved my kids. And I didn't want to lose them."

Hall again encountered the Defendant in Tom's Bar in Portland that night after midnight:

"A. I ask him what he meant when he said, what he was going to do with me. At the house. And eh, he said that he didn't say that. That he'd wanted to put the guns upstairs in the attic or that Chuck had wanted to put the guns upstairs in the attic and, eh, Steve didn't want him to because he said I was in it enough."

Hall encountered the defendant again on Saturday night at the American Bar at about 10:30 p. m. Defendant wanted her to have a drink with him, but she went across the street to Tom's, and apparently Defendant followed. She remained at Tom's with the defendant until closing time. When Defendant asked if he could sleep at her house, she told him yes and then told Carrie Wilson that she was going home and then to Jeannie's (Luetta Hunt's). She wanted Carrie to tell Jeannie to come looking for her if she was not home in an hour "Because I wasn't sure what Steve was gonna do."

Defendant and Hall went to her house and Defendant confessed:

"A. Eh, Steve told me that he'd tell me the whole story. And I told him that I didn't want to hear it. And, eh, he told me anyway. He told me about how he had strangled Bruce Lykins with his hands and they tied the coat hanger around his neck to keep people from knowing that he'd done it with his hands. And then, he, told me about, eh, Bruce was gonna bribe Chuck into, eh, some kind of sex, eh, sex pictures and, eh, he was gonna tell his family. So Chuck wished that Bruce was dead. So Steve said that he was dead. And then he told me about, eh, how they tied Bruce to the bed with, eh, his hands. And that's all I can remember."

Witness Hall's testimony was partially corroborated. After the fire the police found a billfold, which was admitted into evidence, in a dresser drawer of the bedroom. It belongs to "Chuck Grimes, Jr." The police also found four color photographs in a different dresser drawer. They portrayed Charles Grimes nude.

The evidence shows that Defendant confessed to a homicide to three different people on three separate occasions. On two of the occasions he was specific about the identity of the victim.

Additionally, Hall's testimony, coupled with the testimony of the pathologist, placed Defendant near the scene of the crime at the time of Lykins' death. The

body was discovered shortly after 4:10 a. m. The pathologist testified that Lykins had been dead for approximately two hours before the fire, which was reported at 3:40 a. m. Thus Lykins was killed some time between 1:40 a. m. and 2:10 a. m. Hall left to take Defendant and Grimes to the trailer park ten (10) to twenty (20) minutes after they initially arrived at her home at 1:30 a. m. From this evidence the jury could infer that Defendant was at or near the scene at the time the murder occurred.

*The photographs complained of (E–13 and E–14) should not have been admitted, and we condemn the use of such evidence.* However, the State's evidence was convincing and Defendant's guilt clearly proved by properly admitted evidence. We are, therefore of the opinion that these photographs did not contribute to the verdict. The error was harmless.

### ISSUE II

 Defendant predicates his challenge to the sufficiency of the evidence upon a discounting of the extrajudicial confessions and an emphasizing of the prejudicial impact of the aforementioned photographs.[2]

"Upon a review for sufficient evidence, this Court will look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If the existence of each element of the crime charged may be found therefrom, the verdict will not be disturbed, (citation omitted). In such a review, we will not weigh conflicting evidence nor will we judge the credibility of the witnesses, (citation omitted)." *Loyd v.*

2. Defendant also argues:

"There was no evidence of probative value, aside from the two (2) extra-judicial statements, showing that appellant performed some personal act whereby he furthered the murder of Bruce Lykins. In order to sustain a conviction herein, such proof is necessary. *Dennis v. State* (1952), 230 Ind. 210, 102 N.E.2d 650." Appellant's Brief at 20.

In *Dennis* the defendant was charged with being an accessory, after the fact, by having helped his brother, the murderer, to evade capture. The Court held that even though the

*State*, (1980) Ind., 398 N.E.2d 1260, 1264, *cert. denied*, (1980) 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105.

The evidence as related above is sufficient to sustain the conviction.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.

corpus delecti of the homicide was proven, there was no evidence, aside from the defendant's confession, that anyone had helped the murderer to escape. In effect, the corpus delecti of the charged offense, aiding and abetting, was not established.

In the case at bar the charge was the murder of Lykins. The evidence of Lykins' body and how he met his death is all that the law requires in order to establish the corpus delecti of the charged offense, murder. *Fleener v. State*, (1980) Ind., 412 N.E.2d 778, 780–81.