Reynaldo Ortiz MARTINEZ, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 782S250.

Supreme Court of Indiana.

July 14, 1983.

Itsia Doris Rivera, Rivera, Schlesinger & de la Torre, East Chicago, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted of Dealing in Cocaine, Ind.Code § 35–48–4–1(1) (Burns Supp.1982) and was sentenced to twelve (12) years imprisonment. This direct appeal presents two issues:

(1) Whether the evidence was sufficient to permit the jury to find, beyond a reasonable doubt, that the defendant had a predisposition to commit the crime charged, thusly negating the defense of entrapment.

(2) Whether Defendant was denied his right to counsel by the trial court's failure to provide sua sponte a competent interpreter of the Spanish language prior to trial.

\*        \*        \*

ISSUE I

Defendant, who sold cocaine to an undercover officer, raised the defense of entrapment. He here contends that the State failed in its burden of showing his predisposition to commit the offense.

"Whether Defendant was entrapped was a question for the jury. On appeal, we review this issue using the same standard that we apply to other challenges to the sufficiency of the evidence. *Williams v. State,* (1980) Ind., 409 N.E.2d 571, 574.

" 'Upon a review for sufficient evidence, this Court will look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If the existence of each element of the crime charged may be found therefrom, beyond a reasonable doubt, the verdict will not be disturbed. (citation omitted). In such a review, we will not weigh conflicting evidence nor will we judge the credibility of the witnesses.' *Loyd v. State,* (1980) Ind., 398 N.E.2d 1260, 1264, *cert. denied,* (1980) 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105." *Marts v. State,* (1982) Ind., 432 N.E.2d 18, 22–23.

The evidence most favorable to the State reveals that undercover officer Lawson met Defendant in East Chicago at the home of a confidential informant. The meeting was a chance encounter during which both men discussed the narcotics business.

"A. We got on the subject of drugs. He asked me if I had been buying drugs from this particular informant, and I told him I hadn't been buying from him, that I had been buying from a friend of his. And he related to me that I should be very careful of this person who was the confidential informant because he suspected him of having set him up earlier in that year. And he further related to me that if I was interested in buying drugs, that he had several sources which were available to him." R. at 78.

Defendant also identified sources, which the officer knew as the "old Puerto Rican organization," a group that dealt in drugs. Defendant further represented that he could obtain cheaper prices and inferentially a better quality of goods because he was closer to the source. He also related that he had smuggled dope for the syndicate, that he knew who had committed some recent dope related homicides in East Chicago and that he could obtain as much cocaine as he wanted from a Ray Lopez, who was already a target of the investigation.

Thereafter, Defendant and Lawson spoke often about drugs by telephone and in person. Defendant urged Lawson to go to Chicago, because the merchandise was cheaper there; however, Lawson wanted to limit his investigation to the targeted area of East Chicago.

The jury heard two tape recordings of telephone conversations in which Lawson and Defendant discussed the purchase of drugs. Defendant told Lawson to pick him up at the corner of Broadway and Ridge Road, which Lawson did. They went to a residence in Gary and stayed there about two hours, after which, at the urging of Defendant, they hurried to catch Ray Lopez at his automobile service station in order to obtain a sample of cocaine. Enroute, they stopped at a bar, and, after speaking to a young lady there, Defendant requested the money to purchase the cocaine sample. He instructed Lawson to wait a few minutes and then proceed to a Shell service station located opposite Mr. Lopez's service station. Officer Lawson's testimony continued:

"Q. After you got to the Shell station located across from the gas station owned by Ray Lopez, what, if anything did you observe when you got to that location?
"A. I observed at that time I observed the defendant and Mr. Lopez engaged in a conversation and after a brief period of time, the defendant walked across the street over to where I was at in the Shell gas station, and he handed me a foil packet containing the suspected cocaine at that time." R. at 125–26.

During the entire series of events above related, Lawson was followed by undercover officers.

Defendant argues that it took considerable urging by Lawson to arrange the delivery, an inference he draws by virtue of the length of time that it took Lawson to gain his confidence. However, the evidence is equally susceptible of the inference that Defendant was being very careful in his dealings and preferred to conduct business in Chicago.

Defendant further asks us to discount, as mere "braggadocio," the wealth of knowledge about drug traffic that he had conveyed to Lawson. The jury was not so obligated, notwithstanding the lack of specific additional corroborative evidence of

Defendant's past involvement in the drug trade. He also asks us to attach significance to the officer's admission that Lopez was the intended target and that they, Defendant and Lawson, had never discussed details about prices. While they had not discussed the price of cocaine in Chicago when Defendant represented that it was cheaper there, they had discussed price immediately prior to the purchase, at which time Defendant requested one hundred dollars for the sample but stated that it would probably cost only eighty dollars.

Neither do we find the "substantial prodding" of the defendant by Officer Lawson upon which he relies. The pre-transaction discussions, some of which Defendant originated, permit an inference that Defendant, without any prodding whatsoever, wanted to arrange a sale in Chicago. And, while Lawson may have driven the motorcycle, Defendant provided the specific directions, took him through the intermediaries, negotiated the sale, and returned with the cocaine. This record contains ample evidence from which the jury could find, beyond a reasonable doubt, that Defendant was predisposed to sell cocaine to Officer Lawson. *Marts v. State, supra; Grimm v. State,* (1978) 268 Ind. 145, 148, 374 N.E.2d 501, 503; *See Stewart v. State,* (1979) 271 Ind. 169, 390 N.E.2d 1018, 1021; *Whitham v. State,* (1977) 173 Ind.App. 63, 65–66, 362 N.E.2d 486, 487–88.

### ISSUE II

Defendant next contends that he was denied the right to counsel in that the trial court failed to provide a competent and independent Spanish interpreter. See Ind.Code § 35–1–8–2 (Burns 1979) (repealed September 1, 1982); *Skaggs v. State,* (1886) 108 Ind. 53, 56, 8 N.E. 695, 697. He claims that he was unable to communicate with his counsel prior to trial; however, although trial counsel assigned this error in the motion to correct errors, we observe that he did not request an interpreter prior to trial and that no evidence was presented upon this issue. *See Martinez v. State,* (1983) Ind.App., 449 N.E.2d 307, 309; *People v. Ramos,* (1970) 26 N.Y.2d 272, 258 N.E.2d 197, 309 N.Y.S.2d 906.

At the sentencing hearing, Defendant read a letter to the court in which he expressed dissatisfaction with the inmates who had interpreted for him at the jail prior to trial. There is, however, no showing of anything that would have or should have been done differently in preparing the defense. Considering the strength of the State's case, the absence of any such showing is understandable. Defendant did have a court appointed interpreter throughout the trial, beginning with the selection of the jury. Moreover, the transcript of the tapes of the telephone calls reveals that Defendant spoke and understood English well enough to have conversantly discussed the drug trade in English with a police officer and to have orchestrated the events which support his conviction for the instant offense. The police officer testified that he had had no trouble understanding Defendant, who also had no difficulty answering questions while testifying at the sentencing hearing. This record does not demonstrate that Defendant was harmed by not having had the trial court sua sponte appoint an interpreter prior to trial.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.