**William SHIELDS, Appellant (Defendant/Petitioner Below),**

v.

**STATE of Indiana, Appellee (Plaintiff/Respondent Below).**

No. 1081S304.

Supreme Court of Indiana.

March 26, 1986.

Lex Venditti, of counsel, Spangler, Jennings, Spangler, & Dougherty, Merrillville, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Justice.

The appellant, William Shields, was convicted after trial by jury of murder, and murder in the perpetration of a robbery. He was sentenced to a life term in prison. Ind. Code § 35–13–4–1 (repealed).

After Shields' direct appeal was perfected, this Court granted his motion to file a petition for post-conviction relief during the pendency of the appeal. The trial court denied the requested relief. Consolidated for review, the issues on appeal from trial and from denial of post-conviction relief are as follows:

1. Whether the evidence was sufficient to sustain his conviction for murder;

2. Whether the court erred in allowing the testimony of State's witness Phyllis Cornett;

3. Whether the court erred in denying Shields' request to present a witness on surrebuttal;

4. Whether the court erred in entering judgment against Shields on both murder and felony murder; and,

5. Whether the court erred in denying Shields' petition for post-conviction relief on the basis of newly-discovered evidence.

We affirm the conviction for murder, but remand with instructions to the trial court to vacate the judgment of conviction for felony murder.

## I. Sufficiency of the Evidence

■ Appellant claims the evidence was insufficient to convict him of murder. The facts are as follows.

On the morning of June 6, 1977, Clarence Isakson was shot and killed in his home in Hobart, Indiana. Mrs. Isakson was beaten and shot in the head, but she survived the attack. She told a neighbor that four people in "stocking caps" had broken in, beaten her, and ransacked the house. She said Mr. Isakson was "done for". Mrs. Isakson did not realize she had been shot in the head.

At the scene, the police found as evidence a shoe print, a man's wallet, a beer bottle, a glove, and a flashlight. Investigation of the crime led the police to suspect Glenn Cornett and William Shields, the appellant. Police officer Larry Todd was acquainted with Cornett's wife, Phyllis, and he questioned her about her knowledge of the incident.

Initially, Phyllis denied having any information about the murder. Todd testified that she appeared shaken when he asked her about it. There was testimony that Phyllis was afraid of her husband and that he had threatened her not to talk to the police about the crime. Finally, however, after Glenn was incarcerated on other charges and Phyllis was reassured that he would not soon be released, she indicated to Officer Todd that she would tell about the Isakson murder.

In the first interview of Phyllis, she told the police that Glenn and appellant had killed Isakson. She said that one day in June, 1977, Glenn came home with blood on

his clothes. Later, he was upset because he could not find one of his gloves. She also said Shields had a flashlight similar to the one found at the scene.

Phyllis told the police that Shields had admitted to her his role in the crime. She said appellant told her that he and Glenn wore ski masks, and that Glenn had kicked in the Isakson's door and Shields had followed with the gun. They hit Mrs. Isakson, and when Shields could not bring himself to shoot her, Glenn took the gun and shot her in the head. Then Glenn shot Mr. Isakson. Phyllis told the police the names of the other two men who drove with Glenn and Shields to the Isakson's house, and she reported the driver's name.

In a second interview, Phyllis described the layout of the Isakson's house, and she said the glove found at the scene resembled Glenn's lost glove. Officer Jeffrey Miller testified that her description of the scene was corroborated by the physical evidence and that he checked the newspapers after talking to her and verified that she could not have taken her information from the newspapers. The more Phyllis told them, the more the officers believed that she too had been in the Isakson's house. Nonetheless, she maintained she was not there but that she either dreamed it or Shields had told her about it.

Finally, Phyllis admitted that she had been at the scene of the crime. She said she had tried to "place it in her mind" as only a dream because it had been such a horrible experience.

In a third interview, she said that she, Glenn, appellant, and three others drove to the Isakson's house to commit a robbery. Appellant and Glenn went in while the others waited in the car. Phyllis said she saw Mrs. Isakson run out the front door, but Glenn and Shields dragged her back inside. Phyllis then started to approach the house and she heard a gunshot. When she entered, she saw Mrs. Isakson on the floor. Phyllis heard another gunshot, walked down the hall, saw Glenn and caught a glimpse of Mr. Isakson on his bed.

Phyllis testified at trial. Her testimony tracked what she had told the detectives little by little in the three interviews. Again, she described the layout of the house and what she observed inside. She said her husband had threatened her to remain silent by holding a gun to her head. She identified Glenn's glove and his footprint from photographs of the scene. She was unequivocal in her testimony that Shields entered the house with Glenn and that while they were inside Mr. Isakson was shot. Her testimony clearly implicated appellant in the murder either as the principal or an accomplice.

In support of his claim that the evidence was insufficient, Shields argues specifically that Phyllis' testimony was inherently improbable and unworthy of belief. He points to her motive to have her husband convicted, her attempted suicide, and a visit she made to a psychiatrist. He also reminds us of her prior inconsistent statements, such as her story to the police that she dreamed the incident. Additionally, he points to the testimony of Valparaiso attorney, Calvin Hubbell, who stated that Phyllis telephoned him during the period of time she was being interviewed by the police and told him she did not know anything about the crime and that she had implicated Glenn and appellant only to tell the police what she thought they wanted to hear. Phyllis denied having placed that phone call.

Shields is asking that we reweigh the evidence and the credibility of the witnesses. We will not, as our standard of review is to look only to the evidence most favorable to the State. *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260. Where substantive evidence of probative value was elicited on each element of the crime, we will not overturn the verdict. *Id.* Phyllis' testimony was corroborated by physical evidence and, despite some inconsistencies and her initial reluctance to admit her own involvement, she was unequivocal in her implication of appellant. We cannot find she was unworthy of belief. The jury was aware of the inconsistencies in Phyllis' testimony and of her motives and biases, and

it alone was responsible for assessing her credibility. *Wilson v. State* (1983), Ind., 455 N.E.2d 1120.

Shields also argues that the court erred in not directing a verdict in his favor after, he claims, the State failed to prove venue and identification of Shields as the perpetrator of the crime. Shields presented a defense at trial, and, therefore, relinquished any argument in favor of a directed verdict. *Hall v. State* (1978), 269 Ind. 24, 378 N.E.2d 823. In any event, we disagree with him that the State's case was deficient on venue and identification.

After Phyllis testified about Shields' role in the crime, she was asked, "Do you see Bill Shields, you've said was with you at that house in June of 1977, do you see him in the courtroom today? She answered, "Yes, I do", and the prosecutor said, "I wonder if you would point him out and describe briefly what he is wearing?" Her response was, "He's (sic) dark brown jacket with light pants, glasses, moustache".

Although the record does not show explicitly that Phyllis pointed out appellant, she was asked to do so and to describe him, which she did. The clear implication is that her identification was of the defendant, William Shields. He has not shown that the identification was insufficient. *See, Iseton v. State* (1984), Ind.App., 472 N.E.2d 643.

"Proper venue", proof that the crime charged occurred in the county in which the trial is taking place or from which the cause was removed, must be proven by a preponderance of the evidence. *Morris v. State* (1980), 274 Ind. 161, 409 N.E.2d 608. Shields contends the evidence was insufficient to prove that the murder of Mr. Isakson occurred in Lake County, Indiana.

As with any sufficiency question, we will not reweigh the evidence. *Id.* At trial, Ronald Kurth identified himself as a patrolman with the *Lake County* Police Department. He was dispatched to the scene of the crime when it was first reported. Also, a neighbor of the Isakson's, to whom Mrs.

Isakson went for help after the incident, testified that her address was 1205 E. 37th Avenue, Hobart, across the street from the Isaksons, whose address she said was Route I, Hobart Township. We take notice of the fact that Hobart Township is in Lake County, Indiana.

Although the State did not elicit direct testimony that proper venue was in Lake County, we find the circumstantial evidence was sufficient to lead the trier of fact to conclude that the venue of the trial was proper. *See, Morris v. State* (1980), 274 Ind. 161, 409 N.E.2d 608.

## II. Witness' Competency

Shields argues for the first time that Phyllis should not have been allowed to testify as a matter of law because she had visited a psychiatrist, had attempted suicide, and was impeached for bias and prior inconsistent statements. Were these factors sufficient to render one incompetent as a witness, our courts would hear very brief trials indeed. Phyllis' bias, her inconsistencies, and her prior state of depression went to the weight of her testimony, which was for the jury to determine. *See, Wilson v. State, supra,* 455 N.E.2d 1120.

## III. Surrebuttal

The defense presented testimony that Phyllis had telephoned Calvin Hubbell and had discounted to him the story she had told the police. A tape-recording of the conversation, in which the caller identified herself as Phyllis, was played for the jury. Hubbell testified he was familiar with Phyllis' voice and that he believed it was she who placed the call to him, but Phyllis testified that she had not placed the call.

Another tape recording was made, a voice exemplar, in which Phyllis read a transcription of the telephone conversation. Two voice print experts testified during State's rebuttal that, although the voices on the original tape and on the exemplar sounded similar to the ear, their scientific studies of the two tapes led them to the

opinion that the voices were not of the same person.

The defense requested leave to present a surrebuttal witness, Cornett's brother, who would testify that the voice in the original tape of the call to Hubbell was indeed Phyllis'. The foundation of this testimony would have been only his general knowledge of Phyllis' voice, rather than any specific knowledge about the circumstances of the phone call.

The court denied the request, ruling that the evidence would be only cumulative of Hubbell's earlier testimony that *he* was familiar with Phyllis' voice and that it was she who placed the call to him. Shields argues the court erred in its ruling.

█ Admission of rebuttal evidence is within the court's discretion. *Ramos v. State* (1982), Ind., 433 N.E.2d 757. We cannot find here that the court abused its discretion. The proferred testimony from co-defendant Cornett's brother that the voice on the tape was Phyllis' would have been of minimal value not only because it was cumulative of Hubbell's testimony, but also because of Cornett's brother's partiality.

Furthermore, the jury heard Phyllis' voice during her testimony and on the exemplar, and it heard the tape of the call to Hubbell. Therefore, the jury was given ample opportunity to reach its own conclusion about the weight of the experts' testimony after hearing the similarities between Phyllis' voice and the voice on the tape. The court did not abuse its discretion.

IV. Denial of Post-Conviction Relief

After Shields was convicted of the crime, Phyllis signed an affidavit in which she said she *had* in fact made the disputed telephone call to Hubbell in which she indicated she had lied to the police about her knowledge of the murder. In the affidavit she also stated that Cornett, who had also been tried and convicted, was in jail for "something he didn't do".

At the post-conviction hearing, however, Phyllis said there was nothing about her trial testimony that she wanted to change. She said she did not recall the substance of the affidavit. She testified she had told the truth at trial, and that she had never told anyone otherwise.

Hubbell's attorney testified he took Phyllis' affidavit after warning her that she could be prosecuted for perjuring herself at the trial. After his testimony, Phyllis said:

Can I say something? I made the statement after I received two visits from my sister-in-law, I was threatened, I was paranoid, I got a purse full of letters, nothing but threats that's been brought on me ever since this trial happened. I was a basketcase when I talked to that guy. I've broken down several times crying.

The court responded:

I figured it was something like that.... She has recanted her recantation. Thus, her original statement stands.... I find that Phyllis K. Cornett has recanted her affidavit ... and that has reaffirmed her trial testimony, and the Court believes her. Specifically, finding that the testimony that she gave at trial was true and correct. And that the Petition for Post-Conviction Relief is, therefore, denied.

In appealing the denial of post-conviction relief, Shields has the burden of proof and is appealing from a negative judgment. *Young v. State* (1984), Ind., 470 N.E.2d 70. The trial judge, as trier of the facts, is the sole judge of the weight of the evidence and the credibility of the witnesses. *Id.* It is only where the evidence is without conflict and leads to but one conclusion not reached by the trial court that its decision will be overturned as contrary to law. *Id.*

█ Shields cannot meet his burden of proof. Even were it clear that Phyllis' post-trial affidavit went beyond a recantation of her testimony about the phone call and about her *husband's* role in the crime and also included a recantation of her testimony implicating Shields, we find that the trial judge was not in error when he ruled that Phyllis had "recanted her recantation".

### V. Conviction on Two Homicides

 Shields correctly argues that the court erred in entering judgment of conviction on both counts, murder and felony murder. Only one homicide occurred, and Shields should not have been convicted of two counts of murder. *See, Kokenes v. State* (1938), 213 Ind. 476, 13 N.E.2d 524. The cause is remanded with instructions to the court to vacate the judgment of conviction for felony murder.

In all other things, the judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, PIVARNIK and DICKSON, JJ., concur.